**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

GREGORY E. CAPLINGER,
    *Defendant-Appellant.*

No. 01-4878

Appeal from the United States District Court
for the Western District of North Carolina, at Statesville.
Thomas A. Wiseman, Jr., Senior District Judge,
sitting by designation.
(CR-99-39-W)

Argued: May 9, 2003

Decided: August 11, 2003

Before WILLIAMS, MICHAEL, and SHEDD, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion. Judge Michael wrote the opinion, in which Judge Williams and Judge Shedd joined.

## COUNSEL

**ARGUED:** Thomas Kieran Maher, RUDOLF, MAHER, WIDEN-HOUSE & FIALKO, Chapel Hill, North Carolina, for Appellant. B. Frederic Williams, Jr., Assistant United States Attorney, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Robert J. Conrad, Jr., United States Attorney, Holly A. Pierson, Assistant United States Attorney, Charlotte, North Carolina, for Appellee.

**OPINION**

MICHAEL, Circuit Judge:

Gregory E. Caplinger was tried and convicted in the Western District of North Carolina on six counts of wire fraud and two counts of international money laundering. Caplinger's convictions and sentence arise out of his successful efforts to attract investment in a bogus scheme to market worldwide a drug that was supposed to be effective in treating HIV/AIDS and cancer. Caplinger appeals his convictions for money laundering and his 168-month sentence. We affirm the convictions for money laundering. With respect to Caplinger's sentence, we affirm the district court's use of the money laundering guidelines, its grouping of the wire fraud and money laundering counts, and its determination of the amount of loss. The district court erred, however, in assessing Caplinger with a two-level enhancement under U.S.S.G. § 3B1.3 on the ground that he abused a position of trust when he misrepresented himself as a prominent physician in his efforts to attract investors. We therefore vacate Caplinger's sentence and remand for resentencing without this enhancement.

I.

Caplinger was indicted and tried on six counts of wire fraud, *see* 18 U.S.C. § 1343, and two counts of international money laundering, *see* 18 U.S.C. § 1956(a)(2)(A). The essence of the government's case was that Caplinger engaged in a scheme to defraud investors who put money into Caplinger's purported effort to market ImmuStim, a medicine he represented to be effective in treating HIV/AIDS and cancer. At a seven-day trial held in July 2000, the government relied heavily on the testimony of David Weekly and Harry Kampetis, both of whom had pled guilty to fraud charges stemming from the same scheme.

In 1993 before Caplinger came onto the scene, Weekly, a stock broker, and Kampetis, a retired banker, formed the Diamond Group, an investment partnership based in North Carolina. The partnership promised investors that it would invest in prime bank notes and provide a guaranteed return of 20 percent. The scheme was crooked, and the Diamond Group (Weekly and Kampetis) soon experienced diffi-

culty in paying the returns promised to investors. In 1994, at a time when the Diamond Group partnership was desperate to find ways to avoid a collapse, Kampetis was introduced to Caplinger, who Kampetis believed was a physician operating a clinic in Santo Domingo, Dominican Republic. Caplinger claimed that he had access to ImmuStim, a high-powered drug produced by C-Systems in Havana, and that he had successfully tested the drug on patients with HIV/AIDS and cancer. Caplinger said he had plans to license and market ImmuStim worldwide, and he invited Kampetis to join in the venture. Caplinger told Kampetis that worldwide sales of ImmuStim "would generate a significant amount of revenue because of how effective [the drug] was." Caplinger represented that work was under way to obtain a U.S. patent on ImmuStim, which would be worth about $5 million. Kampetis suggested to Weekly that their Diamond Group invest in a Caplinger-led effort to market ImmuStim.

Caplinger held himself out to Weekly and Kampetis as a physician who had received medical degrees from schools in Great Britain and the Dominican Republic. In addition, Caplinger claimed to have received a number of academic and professional honors, including a nomination for the Nobel Prize in Medicine. (At trial the government offered evidence that Caplinger had presented false credentials to Weekly and Kampetis. Almost all of Caplinger's medical "degrees" were "mail order" ones bought with no study required. For instance, Caplinger claimed to have received a medical degree from the Metropolitan Collegiate Institute (MCI) in Great Britain and a Doctor of Science degree from Sussex College of Technology, also in Great Britain. An expert witness for the government testified that a medical degree from MCI could be bought for $100 with no study required. Sussex College of Technology was a one-man operation run out of a private home where mail order degrees could be obtained at all levels in all fields, with no study required. The "nomination" for the Nobel Prize came from Sussex General Hospital, whose address was a mail-drop; there was no hospital facility. Caplinger presented evidence that he held a valid medical degree from Autonomous University of Santo Domingo. His witnesses testified that a medical degree could be obtained from this institution by presenting medical degrees earned outside the Dominican Republic, completing several medical courses, and passing a competency exam. The registrar of Autonomous University testified that Caplinger had met these requirements.)

As part of his effort to persuade Weekly and Kampetis to invest with him, Caplinger presented them with what were purportedly accurate financial statements and records for his corporation, World Medical Services. The documents showed that the corporation had a net worth of $8,799,500. According to the records, World Medical Services had purchased a large supply of ImmuStim, and Caplinger had already solicited and received orders for its resale. The corporate records did reflect, however, that Caplinger's operations had earned profits of only $132,000 in ten years. (According to the government's evidence at trial, Caplinger had provided Weekly and Kampetis with statements about the value of his corporation that were materially false.)

After reviewing Caplinger's credentials, assessing the financial data that Caplinger provided about World Medical Services, and considering Caplinger's plan to market ImmuStim, Weekly and Kampetis decided that "the investors [they] represented and their funds would have a chance to really profit substantially" by putting money into Caplinger's venture. Weekly and Kampetis began sending money to Caplinger in the spring of 1995 and continued to do so for the next two years. Weekly and Caplinger did not inform investors in their Diamond Group partnership that substantial sums of partnership money (about $1.6 million in all) were being invested in Caplinger's venture. As Weekly and Kampetis continued to send more and more money to Caplinger, they decided that they needed "to protect the position of the investors in the United States." In the fall of 1995 Weekly and Kampetis incorporated Immuno Pharmaceuticals, Inc. (IPI) in the United States and persuaded Caplinger to transfer all assets of World Medical Services to IPI. Weekly, Kampetis, and Caplinger were the primary shareholders in IPI, but they sought additional investors. Weekly and Kampetis attempted to sell shares of IPI to large institutional investors, such as Shearson Lehman, but none were interested. They were, however, able to sell shares to individual investors. Weekly and Kampetis provided potential investors with solicitation materials, including brochures and a video, describing Caplinger's clinic, the ImmuStim marketing project, and ImmuStim's success rates on patients at Caplinger's clinic. (The government did not attempt to prove at trial that ImmuStim is ineffective.) Weekly told potential investors that investment in Caplinger's ImmuStim marketing venture would produce lucrative returns. Approximately fifteen

investors paid a total of $230,000 to buy shares of IPI stock. These monies were wired to Caplinger.

Several IPI investors and potential investors, including the following four, testified for the government at trial. Jane Henderson testified that Weekly contacted her about investing in IPI. Weekly sent her and her husband a brochure about IPI and an article written by Caplinger in Spanish. The Hendersons were told that "with a little more investment . . . ImmuStim could be marketed worldwide." They invested $30,000 in IPI. Mrs. Henderson testified that she spoke with Caplinger on one occasion to seek advice about potential cancer treatment for her grandmother. LaGena Green, a North Carolina actress who is HIV positive, testified that she was approached by Weekly and asked whether she would be willing to be a spokesperson for ImmuStim in exchange for free treatment. Green was flown on two occasions to the Dominican Republic where she was treated at Caplinger's clinic. Despite intense pressure from Weekly and Kampetis to serve as ImmuStim's spokesperson, Green declined. She did not invest in ImmuStim and did not pay for the treatment she received at Caplinger's clinic. Barry Burke, a childhood friend of Weekly, invested in IPI after Weekly talked up Caplinger's project and gave Burke brochures about IPI that touted the successes of ImmuStim. Vincent Khau, a potential investor, testified that Weekly and Kampetis flew him to the Dominican Republic to meet with Caplinger. While there, Khau was taken to Caplinger's resort condominium and shown around Caplinger's offices. He was given a sample vial of ImmuStim to take home and show to his investment partner. Khau backed out of investing over $1 million in IPI after discovering that Caplinger had been convicted several years earlier for practicing medicine without a license in North Carolina.

Weekly and Kampetis sent $1,800,000 to Caplinger, either from Diamond Group funds or the sale of IPI shares. All of the funds were wired from the United States to the Dominican Republic. Six specific transfers to Caplinger were the basis for the wire fraud counts against him: $49,000 on May 4, 1995; $25,000 on October 3, 1995; $50,000 on November 29, 1995; $825,000 on December 15, 1995; $70,000 on April 9, 1996; and $40,000 on September 20, 1996. The November 1995 transfer of $50,000 and the December 1995 transfer of $825,000 also formed the basis for the two money laundering counts. Caplinger

told Weekly and Kampetis that the $50,000 was required to keep Caplinger's clinic operation going. Caplinger said that the $825,000 was needed to pay for a substantial order of ImmuStim. He made constant requests to Weekly and Kampetis for money during the two years they were involved with him. Caplinger represented that funds were needed to pay staff, to pay expenses for the clinic, to buy medical supplies, and to maintain a corporate airplane. Caplinger told FBI Agent Julia Mueller that he received almost $2 million from Weekly and Kampetis, which he used to make payments for ImmuStim supplies, to pay legal bills, to maintain the airplane, and to keep the clinic running. According to Caplinger, he did not know the individual sources of the money sent by Weekly and Kampetis, but he knew that it came from investors solicited by them.

Weekly and Kampetis learned about Caplinger's conviction for the illegal practice of medicine in the fall of 1996. The two men nevertheless continued their relationship with Caplinger. By January 1997, however, Weekly and Kampetis could no longer raise funds for Caplinger's speculative venture. By the spring of that year they were fending off calls from concerned investors demanding interest payments and information about their investments. Weekly and Kampetis became skeptical about Caplinger and his ImmuStim project because the clinic was not generating revenues, and they appeared to be funding the entire operation. By the spring of 1997 two years had passed, and Weekly and Kampetis had not received any return on their investment with Caplinger. At that point, they ended their relationship with Caplinger and sought legal counsel. In May 1997 Weekly began cooperating with the FBI. Both Weekly and Kampetis were charged with fraud and entered plea agreements. The government promised to recommend reduced sentences in exchange for their cooperation and testimony against Caplinger.

At trial, following the denial of his motion for acquittal, Caplinger was convicted by the jury on all eight counts. The Presentence Report (PSR), adopted by the district court, used the money laundering guidelines, and not the ones on fraud, to calculate Caplinger's offense level. The entire $1,800,000 received by Caplinger by wire was treated as a loss under the money laundering guidelines in calculating the offense level. Caplinger objected both to the use of the money laundering guidelines and the treatment of the entire $1,800,000 as

the loss under those guidelines. FBI Agent Mueller testified at sentencing that all of the funds wired to Caplinger were used to promote his fraudulent scheme. The district court concluded that Caplinger's "continuing enterprise" was supported by all of the funds sent to him by Weekly and Kampetis and that $1,800,000 thus represented the appropriate loss under the money laundering guidelines. The district court also adopted, over Caplinger's objection, the PSR's recommendation for a two-point enhancement for abuse of trust under U.S.S.G. § 3B1.3. The enhancement was based on Caplinger's representation, which was passed on to potential investors, that he was a physician. On October 30, 2001, the district court sentenced Caplinger to 168 months imprisonment and three years supervised release; Caplinger was also ordered to pay monetary penalties of $1,059,000 in restitution and $450 in special assessments. Caplinger appeals his international money laundering convictions and his sentence. He does not appeal his wire fraud convictions.

## II.

Caplinger first argues that the evidence was insufficient to prove the intent element of the two international money laundering charges. In reviewing a sufficiency of the evidence challenge to a jury verdict, we decide whether there is "substantial evidence, taking the view most favorable to the Government, to support [the verdict]." *Glasser v. United States*, 315 U.S. 60, 80 (1942). The international money laundering counts were based on two wire transfers from Weekly and Kampetis to Caplinger, the first in November 1995 for $50,000 and the second in December 1995 for $825,000. To prove that Caplinger engaged in international money laundering, the government had to show that he caused funds to be transferred "from a place in the United States to or through a place outside . . . with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(2)(A). *See also id.* § 1956(c)(7)(A) (defining "specified unlawful activity" to include wire fraud). Caplinger contends that the government failed to prove that he arranged to have the funds transferred "with the intent to promote" his unlawful activity, namely, his bogus ImmuStim marketing scheme that was funded by wire fraud. As Caplinger recognizes in his brief, we have held under the domestic money laundering statute, 18 U.S.C. § 1956(a)(1)(A)(i) — a statute containing the same "intent to promote" language — that intent to

promote is proven with evidence that the defendant *used* proceeds from an unlawful scheme to keep the scheme going. *See United States v. Stewart*, 256 F.3d 231, 249-50 (4th Cir. 2001); *United States v. Wilkinson*, 137 F.3d 214, 221 (4th Cir. 1998). Caplinger's specific argument is that the government failed to prove use because it did not introduce any bank records or other documents "to show what was actually done with the money once it [was] transferred." Appellant's Br. at 23. In construing the companion domestic money laundering statute, however, we have held that the use of unlawful proceeds to further an unlawful scheme can be proved without records documenting specific expenditures. *Stewart*, 256 F.3d at 249. Rather, use can be proved by other competent evidence, including circumstantial evidence, that the defendant applied unlawful proceeds to promote and perpetuate his scheme. *Id.*

The government contends there was sufficient evidence to allow the jury to find that Caplinger used the $50,000 and the $825,000 transfers to keep his illegal scheme going. We agree. The government's evidence established that Caplinger told Weekly and Kampetis that he needed the $50,000 to keep the clinic in operation. Caplinger told Weekly that he needed the $825,000 to purchase "a large quantity of ImmuStim." Caplinger made constant pleas to Weekly and Kampetis for money to cover clinic expenses, including rent and salaries, medical supplies, and the maintenance of a corporate plane. Caplinger was in obvious need of funds: in the ten years before Weekly and Kampetis arrived on the scene, Caplinger's operation produced total profits of only $132,000; and Caplinger needed the clinic and all of its trappings to attract investors and to assure them that the ImmuStim marketing project was a sound investment. Following the transfers from Weekly and Kampetis, Caplinger was able to keep the clinic in operation and maintain the corporate airplane, two indications that the money went exactly where Caplinger said it would go. Moreover, Caplinger himself told the FBI that he used the wired funds to buy ImmuStim, to make repairs on the airplane, and to "keep the clinic going." In sum, there was substantial evidence to support the jury's finding that Caplinger intended to promote his fraudulent ImmuStim marketing scheme through use of the transferred funds. *See Stewart*, 256 F.3d at 250. Caplinger's convictions on the two counts of international money laundering are therefore affirmed.

III.

We turn next to Caplinger's challenges to his sentence. We review the district court's factual findings at sentencing for clear error, and we review its legal interpretation of the Sentencing Guidelines de novo. *United States v. Dawkins*, 202 F.3d 711, 714 (4th Cir. 2000).

A.

We start with Caplinger's argument that because this is essentially a fraud case, the district court erred in referring to the money laundering guidelines instead of just the fraud guidelines. Guidelines § 1B1.2(a), however, instructed the district court to refer to the Statutory Index (Appendix A) to identify the guidelines for the statutes of conviction. U.S.S.G. § 1B1.2(a) (2000). The index, in turn, directed the court to the money laundering guidelines, U.S.S.G. § 2S1.1 (2000), for Caplinger's convictions for money laundering under 18 U.S.C. § 1956, and to the fraud guidelines, U.S.S.G. § 2F1.1 (2000), for his convictions for wire fraud under 18 U.S.C. § 1343. The district court therefore did not err in referring to the money laundering guidelines. We will consider next in part III.B whether the court properly applied those guidelines.

B.

Caplinger argues that the district court erred by grouping the wire fraud and money laundering counts under U.S.S.G. § 3D1.2(d) and applying the higher offense level for money laundering pursuant to U.S.S.G. § 3D1.3(b). Section 3D1.2(d) provides for grouping of all "counts involving substantially the same harm . . . [w]hen the offense level is determined largely on the total amount of the harm or loss." Grouping under § 3D1.2(d) results in the calculation of an offense level that is based on the aggregated loss. *See* U.S.S.G. § 3D.1.3(b) (offense level for counts grouped under § 3D1.2(d) corresponds to the aggregated quantity). At the time of Caplinger's sentencing, the law in this circuit was that offenses for fraud and money laundering could be grouped together under § 3D1.2(d) when they are "'closely related.'" *United States v. Bolden*, 325 F.3d 471, 496 (4th Cir. 2003) (quoting *United States v. Walker*, 112 F.3d 163, 167 (4th Cir. 1997)). *See also United States v. Porter*, 909 F.2d 789, 792-93 (4th Cir.

1990); *cf. United States v. Mullens*, 65 F.3d 1560, 1564-65 (11th Cir. 1995) (grouping mail fraud and laundering offenses under § 3D1.2(d)). In *Walker*, for example, the amounts specified in the money laundering counts amounted only to $5051.01, but the district court nevertheless looked to the amount of money involved in the mail fraud counts ($850,913.59) and used that amount to determine the offense level. *Walker*, 112 F.3d at 166-67. We held that this aggregation was permissible because "the facts of the case establish that the mail fraud and money laundering crimes were interrelated," specifically, the "money laundering was part of [the] fraudulent scheme." *Id.*, 112 F.2d at 167. *See also Bolden*, 325 F.3d at 496 (holding that grouping was appropriate when the "money laundering and fraud activities were part of a continuous, common scheme to defraud"); *Mullens*, 65 F.3d at 1565 ("[T]he amount of money collected through fraud was co-extensive with the sums involved in the charged and uncharged money laundering counts and was, therefore, the total amount of funds involved in the ponzi."). On the facts of Caplinger's case, the district court did not err in determining that the money laundering and wire fraud activities were part of a continuous, common scheme to defraud. The court was therefore correct in grouping the wire fraud and money laundering counts and in using the money laundering guidelines to set Caplinger's offense level.

We note that Amendment 634 to the Guidelines, which went into effect just two days after Caplinger's sentencing, explicitly provides for grouping of money laundering counts and counts for the underlying offense under § 3D1.2(c), rather than § 3D1.2(d) as our court had previously allowed. U.S.S.G. Supp. to App. C, Amend. 634 (effective Nov. 1, 2001). (The Amendment completely changes the way in which the offense level for money laundering is calculated. *See* U.S.S.G. § 2S1.1(a) (2001). Rather than setting base offense levels of 23 or 20 for money laundering like the earlier guideline, the amended guideline sets the base offense level at either the offense level for the underlying offense from which the laundered funds were derived or eight plus the number of offense levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds. *See id.*) Amendment 634 does not apply retroactively, however, and thus Caplinger does not benefit from it. *See United States v. King*, 280 F.3d 886, 891 (8th Cir. 2002); *United*

*States v. McIntosh*, 280 F.3d 479, 485 (5th Cir. 2002); *United States v. Sabbeth*, 277 F.3d 94, 99 (2d Cir. 2002).

Caplinger further argues that the district court erred in setting the loss under the money laundering guidelines at $1,800,000, the total of the funds wired to Caplinger by Weekly and Kampetis. Caplinger says that the money laundering loss should have been limited to $875,000, the loss stemming from the two money laundering counts. At the time of Caplinger's sentencing, the money laundering guidelines for a conviction under 18 U.S.C. § 1956 established a base offense level of 23. U.S.S.G. § 2S1.1 (2000). If the money laundered was between $600,000 and $1,000,000, an additional four points were added, bringing the offense level to 27. If the money laundered was in excess of $1,000,000, five points were added, bringing the offense level to 28. *Id.* Thus, if the loss amount had been limited to the funds specified in the money laundering counts under 18 U.S.C. § 1956, Caplinger would have faced an offense level of 27. On the other hand, if (as the district court determined) the loss amount was all of the money ($1,800,000) wired to Caplinger, he faced an offense level of 28. According to Caplinger, the district court erred in setting the loss figure at $1,800,000 (yielding level 28) because the government failed to prove that he used all of the wired funds to promote his fraud scheme. At trial the government presented evidence that Caplinger constantly requested money from Weekly and Kampetis — requests that far exceeded the $875,000 specified in the money laundering counts — to pay for clinic expenses, including rent, staff salaries, and medical supplies, and for other expenses such as maintenance of a corporate airplane. At sentencing FBI Agent Mueller testified that Caplinger told her that the wired money went to pay expenses, including salaries, research, rent, and marketing, and to buy large quantities of ImmuStim. In light of this evidence, the district court did not clearly err in finding that "[t]he continuing enterprise was supported by the money when Mr. Caplinger got the money" and that all of the funds ($1,800,000) Caplinger got from Weekly and Kampetis were used to promote Caplinger's ongoing fraudulent activities. The loss figure under the money laundering guidelines was therefore properly fixed at $1,800,000.

### C.

Finally, Caplinger argues that the district court erred in assessing a two-level enhancement under U.S.S.G. § 3B1.3 for abuse of a posi-

tion of trust. A defendant gets the two-level increase under § 3B1.3 if the district court "determines that [he] abused a position of trust and that abuse significantly contributed to the commission or concealment of the crime." *United States v. Akinkoye*, 185 F.3d 192, 203 (4th Cir. 1999). *See also* U.S.S.G. § 3B1.3 (2000). We review for clear error the district court's factual findings that support the enhancement for abuse of a position of trust. *Dawkins*, 202 F.3d at 714; *United States v. Helton*, 953 F.2d 867, 869 (4th Cir. 1992) (concluding that determinations under both parts of § 3B1.3, abuse of position of trust and use of a special skill, should be reviewed under the same standard). Of course, to the extent the district court undertakes a legal interpretation of any guideline, including § 3B1.3, our review is de novo. *United States v. Gormley*, 201 F.3d 290, 296 (4th Cir. 2000) (concluding that the district court "erred in its interpretation of the guidelines by concluding that tax preparation as practiced by [the defendant] is a special skill" under U.S.S.G. § 3B1.3).

The basic question is whether Caplinger, by posing as an accomplished physician in order to influence potential investors, abused a position of trust with respect to the victims of his fraud scheme within the meaning of Guidelines § 3B1.3. The government argued at sentencing that Caplinger's use of his position as a "physician" significantly facilitated the commission of the fraud. The government presented evidence that investors were given (false) information about Caplinger's medical background and that this background was touted as a reason for the likely success of the ImmuStim venture. Based on this evidence, the district court determined "that it was largely by virtue of the false identification of Mr. Caplinger having these important sounding degrees and important experience, all of which was conveyed to the investors, that the scheme was able to work and that created the position of trust." The district court did not clearly err in its factual finding that Caplinger's asserted position as a physician facilitated the fraud. There is still the question, however, of whether the district court erred in concluding that Caplinger's use of his asserted position as a physician amounted to an "abuse of position of trust" as that phrase is used in Guidelines § 3B1.3. This ultimate determination involved a legal interpretation of § 3B1.3, and we review that interpretation de novo. *See Gormley*, 201 F.3d at 295-96 (reviewing de novo the district court's interpretation of "special skill" as used in § 3B1.3).

We recognize, as do other courts, that "[d]etermining what constitutes a position of trust for the purposes of § 3B1.3 is not a simple task." *United States v. Morris*, 286 F.3d 1291, 1296 (11th Cir. 2002) (quoting *United States v. Iannone*, 184 F.3d 214, 222 (3rd Cir. 1999)). The commentary to § 3B1.3 provides some guidance for deciding whether a defendant occupied a position of trust. "'Public or private trust' refers to a position of public or private trust characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3 comment. (n.1) (2000). *See also Bolden*, 325 F.3d at 504. The commentary also provides specific examples of when the abuse of a position of trust justifies the enhancement: "an embezzlement of a client's funds by an attorney as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination." U.S.S.G. § 3B1.3, comment. (n.1) (2000). Finally, the commentary explains that the "adjustment . . . applies in a case in which the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not." U.S.S.G. § 3B1.3, comment. (n.2) (2000).

We have emphasized that the "position of trust" inquiry must focus on the relationship between the defendant and the victim from the perspective of the victim. *United States v. Gordon*, 61 F.3d 263, 269 (4th Cir. 1995). "There must be a trust relationship between [the defendant] and his victim for the enhancement to apply." *United States v. Moore*, 29 F.3d 175, 180 (4th Cir. 1994) (internal quotation marks and citation omitted) (alteration in original). "In the case of an imposter, it is not merely the defendant's misrepresentation that justifies the § 3B1.3 enhancement. In every case of fraud, the defendant will have [gained the] confidence and trust [of] the victim. But fraud alone does not justify the enhancement." *United States v. Bollin*, 264 F.3d 391, 415 (4th Cir. 2001). *See also Mullens*, 65 F.3d at 1567. A sentencing court must "carefully distinguish between those arms-length commercial relationships where trust is created by the defendant's personality or the victim's credulity," *Bollin*, 264 F.3d at 415 (internal quotation marks and citation omitted), and those "where a 'fiduciary or personal trust relationship exists' with [the victim], and the defendant takes advantage of the relationship to perpetrate or conceal the offense," *United States v. Koehn*, 74 F.3d 199, 201 (10th Cir.

1996) (citation omitted). Only the latter circumstances justify the enhancement. At bottom, § 3B1.3's critical term — "position of public or private trust" — is "a term of art, appropriating some of the aspects of the legal concept of a trustee or fiduciary." *United States v. Garrison*, 133 F.3d 831, 839 n.18 (11th Cir. 1998) (internal quotation marks and citation omitted). In other words, application of the enhancement "requires more than a mere showing that the victim had confidence in the defendant. Something more akin to a fiduciary function is required." *United States v. Brunson*, 54 F.3d 673, 678 (10th Cir. 1995). *Cf. Bollin*, 264 F.3d at 416 (§ 3B1.3 applies when the defendant has broad discretion to act on behalf of the victim, and the victim believes the defendant will act in the victim's best interest); *Moore*, 29 F.3d at 180 (defendant must be in a trust relationship with the victim that permits the defendant to "commit a difficult-to-detect wrong").

The district court identified "the investors" as the victims of Caplinger's fraud scheme. Although the district court did not specifically identify the investors, it appears that the court was referring to those individuals who bought shares of IPI, the corporation through which Caplinger's venture was run. Caplinger's relationship with the investors determines whether he occupied a position of trust. To begin with, the fact that Caplinger posed as a physician does not by itself mean that he occupied a position of trust. *See Gordon*, 61 F.3d at 269 ("The abuse of trust enhancement was not designed to turn on formalistic definitions of job type."). Caplinger did not assume a physician-patient relationship with any of the victims. Rather, the victims were simply investors who put their money in IPI (Caplinger's ImmuStim marketing venture) based on the solicitations and representations of Weekly and Kampetis. Weekly and Kampetis, of course, passed on to the investors information about Caplinger's portrayal of himself as a prominent physician. The false information about Caplinger's credentials and experience did assist in convincing investors and in making them more confident about their investment. But Caplinger had essentially an entrepreneurial relationship with his investors: he held himself out as an accomplished physician who would organize, manage, and promote the ImmuStim marketing project. Any trust the investors placed in Caplinger was not based on a special relationship he had with them as a physician, but on the investors' misplaced belief in Weekly's and Kampetis's representations about Caplinger's

credentials and the ImmuStim project's potential for success. *Compare United States v. Jolly*, 102 F.3d 46, 48-50 (2d Cir. 1996) (no abuse of trust when the defendant solicited loans from investors for bogus business venture but did not hold himself out as an investment advisor or broker to the investors); *Mullens*, 65 F.3d at 1566-67 (no abuse of trust when the defendant operated a ponzi scheme but did not hold himself out as an investment broker and did not have a "special, close, or personal attachment, or fiduciary relationship, with any" of the investors), *with Bollin*, 264 F.3d at 415-16 (abuse of trust when defendants held themselves out as debentures traders and brokers to their clients); *United States v. Hirsch*, 239 F.3d 221, 227 (2d Cir. 2001) (same). In sum, although Caplinger's assumed status as an accomplished physician was used by Weekly and Kampetis to persuade the investors (the victims) to put money into Caplinger's venture, the facts do not support the conclusion that Caplinger, by posing as a physician, occupied a "position of trust" with the victims as that term is used in § 3B1.3 of the Guidelines. *See Morris*, 286 F.3d at 1297. We therefore vacate Caplinger's sentence and remand for resentencing without the enhancement for abuse of trust.

### IV.

To recap, we affirm Caplinger's money laundering convictions. As to the determination of his sentence, we affirm the district court's reference to the money laundering guidelines, its grouping of the money laundering and fraud counts under U.S.S.G. § 3D1.2(d), and its computation of the amount of loss. The district court erred, however, in assessing Caplinger with a two-level enhancement under U.S.S.G. § 3B1.3 for abuse of a position of trust. We therefore vacate the sentence and remand the case for Caplinger to be resentenced without this enhancement.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED*