PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-4479

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

KOFI OHENE AGYEKUM,

Defendant - Appellant.

Appeal from the United States District Court for the Southern District of West Virginia, at Huntington.  Robert C. Chambers, Chief District Judge.  (3:14-cr-00197-1)

Argued:  September 23, 2016          Decided:  January 24, 2017

Before NIEMEYER, MOTZ, and WYNN, Circuit Judges.

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Motz concurred and Judge Wynn concurred in part.  Judge Wynn wrote a separate opinion concurring in part and dissenting in part.

**ARGUED**: Jonathan D. Byrne, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant.  Monica D. Coleman, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.  **ON BRIEF**: Christian M. Capece, Federal Public Defender, Rachel E. Zimarowski, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant.  R. Booth Goodwin II, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.

NIEMEYER, Circuit Judge:

Pursuant to a plea agreement, Kofi Agyekum pleaded guilty to two counts of structuring cash transactions to evade reporting requirements, in violation of 31 U.S.C. § 5324, and agreed to forfeit significant assets. When, at sentencing, the district court calculated Agyekum's sentencing range under the Sentencing Guidelines, it increased Agyekum's offense level based on his leadership role and his abuse of a position of trust in connection with a drug distribution conspiracy that the district court found to be "relevant conduct" under U.S.S.G. § 1B1.3.

On appeal, Agyekum challenges the district court's conclusion that his participation in a drug conspiracy qualified as "relevant conduct" to his structuring convictions. And in connection with his agreement to forfeit assets, he contends that the district court failed to ensure that he was adequately aware of all of the procedural protections he was waiving.

Finding no reversible error, we affirm.

I

In October 2012, Kofi Agyekum and his wife, Patricia Agyekum, opened A+ Care Pharmacy in Barboursville, West Virginia. Patricia was the licensed pharmacist, while Kofi was a licensed pharmacist intern. Kofi had completed pharmacy

2

school but had failed the board examination. Kofi Agyekum, nonetheless, functioned as the chief executive officer of A+ Care Pharmacy, "controll[ing] everything," as his wife later explained.

In June 2014, as IRS and DEA agents were investigating a drug trafficking organization that was illegally distributing oxycodone pills in and around Lincoln County, West Virginia, the agents began to focus on A+ Care Pharmacy as a source of the drugs. Specifically, after agents searched the Florida home of the suspected head of the drug trafficking organization, the suspect agreed to serve as a confidential informant ("CI"), telling agents that he and his fiancée had started filling prescriptions at A+ Care Pharmacy in November 2012, in part because the pharmacy was willing to fill out-of-state prescriptions. The CI indicated that after approximately four months of dealing with A+ Care Pharmacy, Kofi Agyekum, who appeared to be in charge of the pharmacy, told him to have his physician start writing prescriptions for non-narcotics in addition to the narcotic prescriptions to avoid raising the DEA's suspicion. Agyekum also directed that the CI pay for future prescriptions in cash.

The law enforcement agents twice used the CI to make controlled purchases of oxycodone and other drugs from A+ Care Pharmacy. During the first transaction on June 13 and 16, 2014,

3

Agyekum charged the CI $1,100 more than he had previously charged him for the same prescriptions; asked the CI what he was doing with the prescription pill bottles; responded "Ok" when the CI said that he burned the bottles; agreed to fill other out-of-state prescriptions for the CI's employees; and tore off dosing receipts identifying A+ Care Pharmacy as the filling pharmacy before handing over the prescriptions, stating that he did not want to leave a paper trail. During the second transaction on July 21, 2014, when the CI asked if he could purchase oxycodone tablets without a prescription, Agyekum responded that the CI should check with him the following month.

The investigation of A+ Care Pharmacy and Agyekum also revealed their connection with a drug trafficking operation led by Anthony Ferguson, which operated out of Owingsville, Kentucky, and which also used A+ Care Pharmacy as a supplier of oxycodone pills for illegal distribution. Between January and July 2014, Ferguson paid for a number of people to travel regularly to Georgia, Florida, and Virginia to obtain oxycodone prescriptions and fill them at A+ Care Pharmacy, visiting the pharmacy about two or three times a week and filling five to six prescriptions at a time. Ferguson or his lieutenant always paid cash for the prescriptions, and Agyekum charged Ferguson more to fill prescriptions for members of the organization who were "doctor shoppers." In March or April 2014, Agyekum began

4

selling oxycodone to Ferguson without a prescription, usually charging $1,500 for 100 30-milligram oxycodone pills. On one occasion in July 2014, Ferguson gave Agyekum a 2004 Nissan Maxima in exchange for 200 oxycodone pills, and on another occasion later that month, Ferguson bought 1,000 oxycodone pills from Agyekum for $15,000.

According to DEA records, "A+ Care Pharmacy was the third largest distributor of oxycodone in West Virginia for 2014," and the drug made up 70% of the pharmacy's annual dosage units for 2014.

The law enforcement agents also began investigating Agyekum's banking practices. A bank teller at the Fifth Third Bank in Barboursville told agents that when Agyekum attempted to deposit $16,000 in cash into a savings account on December 23, 2013, the teller began completing a currency transaction report for the deposit, as banks are required to do for transfers involving more than $10,000 in U.S. currency, prompting Agyekum to ask how he could avoid the reporting paperwork. After the teller explained the reporting paperwork, Agyekum asked if the report would still have to be filed if he made the deposits on different days or used different branches. He then asked for $7,000 of the cash back, depositing only $9,000 that day. He returned later in the week and made additional cash deposits of just under $10,000.

5

In a similar manner, Agyekum opened a savings account at J.P. Morgan Chase Bank on February 24, 2014, and deposited $13,500 in cash into that account the next day. When a teller asked for his identification in order to prepare the currency transaction report, Agyekum was reluctant to provide it and asked about the amounts that triggered the reporting requirement. After the teller told Agyekum that deposits over $10,000 would require the filing of the report, Agyekum never again deposited over $10,000 in a single transaction. Moreover, in the two-month period after he opened the J.P. Morgan Chase savings account, Agyekum opened six additional accounts on which he was listed as the sole owner and signer.

In total, from March 3 through August 9, 2014, Agyekum made structured cash deposits of $469,930 into bank accounts at five different banks. For example, after A+ Care Pharmacy had taken in approximately $40,647 in cash proceeds during the three-day period from April 22 through April 24, 2014, Agyekum made a series of deposits on April 25, depositing $8,000 in cash at J.P. Morgan Chase Bank; $8,000 in cash at Fifth Third Bank; $9,500 at Huntington National Bank; $2,500 in cash at First Sentry Bank; and another $6,000 in cash into a different account at First Sentry Bank. When he made the deposit at Fifth Third Bank, Agyekum attempted to explain the deposit by telling the branch manager that the cash was coming from his business and

6

that he did not accept checks or credit card payments from his clientele. After the Fifth Third Bank branch manager then gave Agyekum a brochure on structuring and currency transaction reporting requirements, Agyekum opened two new accounts that same day at First Sentry Bank, telling an employee there that he was aware that any cash deposits over $10,000 would have to be reported and assuring the teller that all of his deposits would fall under that threshold. Similarly, after A+ Care Pharmacy took in approximately $40,109 in cash during the period from June 2 through June 4, Agyekum deposited $31,600 in cash in six transactions at four different banks on June 5 and 6, 2014.

When law enforcement agents executed a search warrant at A+ Care Pharmacy on August 14, 2014, they recovered $38,000 in cash that was lying on top of 51,000 oxycodone pills in the pharmacy's safe. Patricia Agyekum later led the agents to another $30,000 in cash that was hidden under Agyekum's desk at the pharmacy. In addition to the cash recovered at the pharmacy, agents also seized 20 bank accounts associated with Agyekum, as well as $442,200 in cash contained in two safe deposit boxes, for a total of $2,361,109.17. The agents also seized Agyekum's 2011 Lexus station wagon, which he had purchased with a cashier's check from one of the bank accounts.

After Agyekum was arrested, a grand jury returned a third superseding indictment that charged him with participating in a

7

conspiracy from August 2013 to August 2014 to distribute oxycodone outside the usual course and scope of professional practice and not for a legitimate medical purpose, in violation of 21 U.S.C. § 846. The indictment also charged him with three counts of distributing oxycodone, and aiding and abetting the same, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Finally, the indictment charged him with 40 counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and 11 counts of structuring currency transactions to evade reporting requirements, in violation of 31 U.S.C. § 5324(a)(3), (d). The indictment also contained a forfeiture notice, informing Agyekum that his 2011 Lexus station wagon, a residence located at 3 Castle Gate, Ona, West Virginia, and a sum of more than $2.3 million in U.S. currency were subject to forfeiture.

More than six months after his arrest, in April 2015, Agyekum signed a written plea agreement in which he agreed to plead guilty to Counts 44 and 45 of the third superseding indictment, which charged him with structuring cash deposits to evade reporting requirements on April 25, 2014 and on June 5 and 6, 2014. He also agreed not to contest the judicial forfeiture of his assets, acknowledging that "all property covered by this agreement [was] subject to forfeiture" and that "the United States could establish, by a preponderance of the evidence, a criminal and/or civil forfeiture proceeding against [him] . . .

8

arising out of his involvement in a money laundering scheme" and "his involvement in . . . a conspiracy to distribute quantities of oxycodone." He also acknowledged "that the forfeiture of assets [was] part of the sentence that [could] be imposed in this case" and agreed to "waive[] any failure by the court to advise him of this, pursuant to Rule 11(b)(1)(J), at the time his guilty plea is accepted." He also agreed to waive "all constitutional and statutory challenges in any manner . . . to any forfeiture carried out in accordance with this Plea Agreement." In return, the government agreed to dismiss the remaining counts of the indictment.

When Agyekum appeared before the district court to plead guilty pursuant to the plea agreement, he told the court that he had reviewed all the paragraphs of the agreement with his attorney and agreed to them with the exception of the paragraph containing the forfeiture provision. He stated that he "disagree[d]" with that paragraph because "the Government is trying to take everything away from me." The court thereupon terminated the plea hearing.

A week later, however, Agyekum again appeared before the district court to plead guilty under the plea agreement. He stated that after further discussion with his attorney, he had decided to go through with the agreement. He stated that he understood "about the forfeiture provisions that are in the plea

9

agreement" and that he wanted the court to accept the plea agreement. When the court inquired specifically whether Agyekum now accepted the plea agreement's forfeiture provision, Agyekum responded that he had "no choice" but to accept the forfeiture. When the district court explained that he did have a choice and that his "choice would be to either comply with the plea agreement or refuse to comply with the plea agreement," Agyekum stated that he understood that and that his decision was to comply with the plea agreement.

After receiving testimony and finding that there was a sufficient factual basis for the guilty plea, the court explained to Agyekum the various consequences of his guilty plea. With respect to the plea agreement's forfeiture provision, Agyekum again acknowledged that he was agreeing to forfeit more than $2.3 million, a Lexus automobile, and his residence and that, if he had chosen not to agree to the forfeiture, "the Government would have [had] to prove to the Court that [his] criminal activity was substantially involved in [his] generating or obtaining the [assets]." At the conclusion of the hearing, the district court accepted the guilty plea, finding that Agyekum understood the rights he was giving up by entering a guilty plea and that his plea was voluntary. The following day, the court entered a preliminary forfeiture order consistent with the plea agreement.

In preparation for sentencing, a probation officer prepared a presentence report, which concluded that Agyekum had a base offense level of 20, pursuant to U.S.S.G. § 2S1.3. The report concluded further that the base offense level should be increased by: two levels pursuant to § 2S1.3(b)(1)(A) because Agyekum "knew or believed that the funds were proceeds of unlawful activity"; two levels pursuant to § 2S1.3(b)(2) because Agyekum "committed the offense as part of a pattern of unlawful activity involving more than $100,000 in a 12-month period"; two levels pursuant to § 3B1.1(c) on the ground that Agyekum "was an organizer, leader, manager, or supervisor in . . . criminal activity"; and two levels pursuant to § 3B1.3 for "abus[ing] a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." With respect to the last two enhancements, the probation officer relied on Agyekum's conduct in the drug distribution conspiracy. When the probation officer reduced the offense level by three levels for Agyekum's acceptance of responsibility and applied the resulting offense level to a criminal history category of I, Agyekum's recommended advisory guideline range became 57 to 71 months' imprisonment.

At the sentencing hearing, Agyekum objected to the enhancements based on his leadership role and his abuse of a position of trust. He argued that "[t]he offensive conduct that

11

he pled guilty to was the structuring, and the evidence that was presented today shows that he . . . didn't oversee or supervise anyone to make these deposits, and he certainly didn't supervise anyone trying to defraud the bank to avoid reporting." He similarly argued that "with the crime of structuring, he was actually depositing h[is] and his wife's money[,] [s]o there was no abuse of trust from a third party." After considering the presentence report, Agyekum's objections to it, and the testimony of three witnesses, the district court concluded that "[t]he relevant conduct here includes the unlawful criminal activity that underlies the structuring," finding that Agyekum was part of "an illegal drug distribution conspiracy . . . and that's why he had the money that he then structured to try to hide." The court found further that it was "clear that [Agyekum] was a manager or supervisor" in the conspiracy because "he ran the pharmacy." The court also overruled Agyekum's objection to the abuse of a position of trust enhancement, reasoning that he had "utilized the limited authority of a pharmacy and of a pharmacist . . . to order huge quantities of controlled substances that he knew he was going to turn around and sell as part of this illegal distribution scheme." After accepting the presentence report's recommended Guidelines range of 57 to 71 months' imprisonment, the district court sentenced

12

Agyekum to 64 months' imprisonment, followed by a three-year term of supervised release.

The next day, the court also entered a final forfeiture order, ordering forfeiture to the United States of roughly $2.3 million and the Lexus station wagon, but dismissing the preliminary order's forfeiture of Agyekum's residence inasmuch as the residence had been "sold by the lien holder at a public auction."

From the final judgment, Agyekum filed this appeal.

## II

Agyekum contends first that the district court erred in calculating his sentencing range when it imposed two sentencing enhancements -- namely, a two-level enhancement for his leadership role, as provided in U.S.S.G. § 3B1.1(c), and a two-level enhancement for his abuse of a position of trust, as provided in U.S.S.G. § 3B1.3. He argues that because he pleaded guilty only to two structuring offenses -- which simply involved his individual conduct as a bank customer -- he could not be imputed with a leadership role or abusing a position of trust. Moreover, he argues that his drug dealing activity, on which the district court relied to impose the enhancements, was not relevant conduct under U.S.S.G. § 1B1.3, for which he could be

13

held accountable when being sentenced for his structuring violations.

The government contends that "[t]he district court properly found that defendant's illegal drug distribution conspiracy was properly treatable as relevant conduct for his offense of conviction when he was structuring the proceeds of his drug dealing to hide the source and nature of his cash." It argues, accordingly, that the enhancements were supported by his role in the drug distribution activity and were properly applied.

To begin, we note that the overarching design of the Sentencing Guidelines is aimed at sentencing defendants in substantial part for "the actual conduct in which the defendant engaged regardless of the charges for which he was indicted or convicted." U.S.S.G. § 1A1.4(a). "Thus, despite the limited scope of conduct for which the defendant was convicted, he may nonetheless be sentenced more broadly for relevant conduct." United States v. McVey, 752 F.3d 606, 610 (4th Cir. 2014) (emphasis added); see also U.S.S.G. § 1B1.3(a) (defining "relevant conduct" for purposes of sentencing accountability and recognizing that such accountability is broader than the defendant's specific criminal liability); id. Ch. 3, pt. B introductory cmt. (noting that the role in the offense adjustments are based on "all conduct within the scope of §

14

1B1.3 . . . and not solely on the basis of elements and acts cited in the count of conviction").

As pertinent here, U.S.S.G. § 1B1.3 defines relevant conduct to include "all acts and omissions committed . . . by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1)(A) (emphasis added). The operative term "during," as relevant here, provides the link between relevant conduct and the conduct constituting the crime of conviction. But necessarily, when defining "relevant conduct," the term "during" conveys a linkage that is more than a mere temporal overlap; it also conveys a qualitative overlap such that the conduct must be related or connected to the crime of conviction. See United States v. Wernick, 691 F.3d 108, 115 (2d Cir. 2012) (holding that "[o]ne criminal act does not become 'relevant' to a second act under [§ 1B1.3(a)(1)(A)] by the bare fact of temporal overlap" and that there must also be "proof of a connection between the acts").

In this case, Agyekum argues that the two structuring offenses to which he pleaded guilty occurred on three discrete dates -- April 25, June 5, and June 6 -- and that he did not engage in drug activity "during the commission of" those charged offenses. This argument, however, overlooks the nature and

15

context of his drug distribution activity and the role that it played in his structuring conduct.

It is true that the offenses of conviction were discrete structuring acts committed on April 5, June 5, and June 6, 2014. But those acts were also temporally and qualitatively linked to Agyekum's drug distribution activity. The evidence presented at sentencing supported the indictment's charge that Agyekum engaged in a drug distribution conspiracy that had begun by August 2013 and that concluded in August 2014, a year that included the dates of his structuring activity and numerous transactions involving hundreds of thousands of units of oxycodone and millions of dollars in cash. While the evidence does not reveal any drug transactions on the specific dates in which he engaged in structuring, the ongoing conspiratorial activity was broader than the individual drug transactions. During the entire year of the conspiracy, Agyekum was ordering oxycodone units from the drug manufacturer's distributor and then providing them illegally to customers. At the same time and on a continuous basis, Agyekum was also storing the oxycodone and illicitly obtained cash in the pharmacy and engaging in ongoing deception by altering records and failing to comply with reporting requirements of the West Virginia Board of Pharmacy. And perhaps most importantly, Agyekum's ongoing drug distribution activity produced the illicit cash that Agyekum

16

deposited in banks in a manner designed to conceal his overall illegal activity. Specifically, by evading reporting requirements at the banks, in violation of the structuring law, Agyekum concealed his illicit drug activity from law enforcement investigators. In light of this evidence, we have little difficulty in affirming the district court's conclusion that Agyekum's ongoing drug dealing activity was conduct engaged in <u>during</u> his structuring offenses, making it relevant conduct under § 1B1.3(a)(1)(A).

The question remains whether this relevant conduct showed that Agyekum was in a leadership role and abused a position of trust so as to support the two enhancements applied by the district court.

Section 3B1.1(c) provides for a two-level enhancement for a defendant's leadership role "[i]f the defendant was an organizer, leader, manager, or supervisor" in a relatively small criminal enterprise. The commentary identifies a number of factors that indicate such a leadership role, including:

> the [defendant's] exercise of decision making authority, the nature of [the defendant's] participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

17

U.S.S.G. § 3B1.1 cmt. n.4. The district court applied these factors and found it "clear that [Agyekum] was a manager or supervisor" in the illegal drug distribution conspiracy, citing his role in running the pharmacy and directing: (1) that the pharmacy would fill out-of-state prescriptions; (2) that the pharmacy would only accept cash for filling oxycodone prescriptions; (3) that the pharmacy charged different prices depending on the risk involved in the transaction; and (4) that those seeking to fill suspicious oxycodone prescriptions were also required to submit prescriptions for non-controlled substances. The court found further that Agyekum "handled all the money[,] . . . controll[ing] all the [bank] accounts in every way." In sum, the district court found that "while there was a pharmacist [at the pharmacy] and she technically filled the prescriptions," the evidence was that Agyekum actually "ran the business" and directed her activities and the activities of the pharmacy. These factual findings, which are supported by the record, justify the application of the leadership-role enhancement.

As to the enhancement for the abuse of a position of trust, the record likewise supports the district court's application of the enhancement. Section 3B1.3 provides for a two-level enhancement if "the defendant abused a position of public or private trust . . . in a manner that significantly facilitated

the commission or concealment of the offense." Such positions are "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference.)" U.S.S.G. § 3B1.3 cmt. n.1. This enhancement therefore may be applied if a defendant abuses the substantial discretion given him as a professional or manager in order to commit or conceal the offense. The "central purpose" of the enhancement "is to penalize[] defendants who take advantage of a position that provides them with the freedom to commit a difficult-to-detect wrong." United States v. Brack, 651 F.3d 388, 393 (4th Cir. 2011) (alteration in original) (internal quotation marks and citation omitted). Thus, for there to be an abuse of trust, "[t]here must be a trust relationship between [the defendant] and his victim," United States v. Caplinger, 339 F.3d 226, 236 (4th Cir. 2003) (second alteration in original) (quoting United States v. Moore, 29 F.3d 175, 180 (4th Cir. 1994)), which the defendant abuses by "tak[ing] advantage of [it] to perpetrate or conceal the offense," id. at 237 (quoting United States v. Koehn, 74 F.3d 199, 201 (10th Cir. 1996)).

Here, Agyekum was both a professional and a manager who abused the considerable discretion inherent in these positions. Specifically, he was a licensed intern in a pharmacy in West Virginia and, at the same time, functioned as the CEO of A+ Care

19

Pharmacy, with full control of it. Inherent in these positions was the professional and managerial discretion with which he designed and implemented the way the pharmacy functioned vis-à-vis the oxycodone distributor from whom A+ Care Pharmacy purchased oxycodone; the State of West Virginia Board of Pharmacy, to whom A+ Pharmacy had ongoing reporting requirements; employees, including his wife as the licensed pharmacist; the pharmacy's banks; the pharmacy's patients and customers; and the public at large. In some of these relationships, but surely not all, Agyekum's role amounted to a position of trust as used in § 3B1.3 in that it involved "substantial discretionary judgment that is ordinarily given considerable deference" and was "subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." U.S.S.G. § 3B1.3 cmt. n.1. And in some of these relationships, Agyekum used that discretion to commit or conceal his illegal activities. For instance, rather than purchasing oxycodone from his distributor for dispensation to patients with prescriptions to serve legitimate purposes, as the distributor assumed he was doing, he purchased oxycodone to supply drug dealers illegally and without prescriptions; and rather than reporting filled prescriptions to the West Virginia Board of Pharmacy as required, he altered computer records to avoid proper reporting and to conceal the extent of his illegal

20

activities. In this manner, Agyekum abused his positions as a licensed intern in a pharmacy and as the functioning CEO with complete control of A+ Care Pharmacy by taking advantage of his role in the relationships with his distributor and the West Virginia Board of Pharmacy. See Caplinger, 339 F.3d at 237. Moreover, Agyekum's conduct corrupted many of his other professional relationships, including his relationship with his wife in her capacity as an employee and the licensed pharmacist at the pharmacy and his relationship with the pharmacy's legitimate customers, whose purchases he used to shield his illegal conduct. We need not, however, rely on the abuse of these or any other relationships because, at a minimum, Agyekum's clear abuse of his positions of trust with the distributor and the West Virginia Board of Pharmacy justified the district court's application of the two-level enhancement.

III

Agyekum also contends that "[t]he district court plainly erred by failing to ensure that [his] waiver of rights related to forfeiture was made knowingly and intelligently by not inquiring as to whether Agyekum was aware of the myriad of procedur[al] rights and protections which he was waiving."

The government contends that the record simply does not support Agyekum's position and that, in any event, Agyekum has

21

failed to show that but for the alleged error he would have not gone through with his guilty plea.

Because Agyekum did not preserve this issue below, our review is for "plain error that affects [his] substantial rights." Fed. R. Crim. P. 52(b).

Based on our review of the record, we conclude that the district court fully informed Agyekum of the terms of the plea agreement and its provision for waiver of any challenge to his agreement to forfeit assets. The plea agreement itself sets forth Agyekum's agreement "that the United States could establish, by a preponderance of the evidence, a criminal and/or civil forfeiture proceeding [against him] . . . arising out of his involvement in a money laundering scheme" and "his involvement in . . . a conspiracy to distribute quantities of oxycodone . . . which generated gross proceeds of at least $2,500,000." The agreement makes clear that Agyekum "consents to, and otherwise agrees not to contest," such a proceeding. And it states that Agyekum "agrees to waive all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement."

When Agyekum first appeared before the district court to plead guilty pursuant to the plea agreement, his attorney summarized the plea agreement in open court, after which the

22

court asked Agyekum, "[D]o you understand what this agreement does and what it requires of you?" Agyekum responded, "Yes, sir." When the court asked Agyekum whether he reviewed each paragraph of the plea agreement with his attorney, Agyekum said, "Yes," but added that he "disagree[d] with" the agreement's forfeiture provision because "the Government [was] trying to take everything away from me." The court concluded the hearing because Agyekum had not agreed to all of the plea agreement's terms. Nonetheless, these facts indicate that Agyekum fully understood the proposed forfeiture provision, although he was troubled by its scope.

A week later, however, Agyekum again appeared before the court after discussing all of his options with his lawyer and stated that he was prepared to accept the plea agreement as written. When asked again whether he went over the plea agreement paragraph by paragraph with his attorney, Agyekum said that he had and that he was accepting the agreement as written. When the court pressed Agyekum further, Agyekum explained that he was agreeing because he had "no choice." The court then stated, "Well, your choice would be to either comply with the plea agreement or refuse to comply with the plea agreement. Do you understand that?" And Agyekum said, "Yes, sir," adding that his decision was "to comply with the plea agreement."

Against these facts, Agyekum simply cannot claim that his waiver was not knowingly and intelligently given.

In any event, Agyekum has also failed to establish that his substantial rights were affected, as necessary for him to succeed under plain error review. While the record does reveal that Agyekum was unhappy with the forfeiture provision, he ultimately decided to accept it as the price of receiving the government's agreement to dismiss 53 counts of the indictment. There is no indication that Agyekum would have made a different decision with respect to his plea had the district court provided some different explanation of the forfeiture provision.

For the foregoing reasons, we affirm Agyekum's conviction and sentence.

AFFIRMED

24

WYNN, Circuit Judge, dissenting in part:

I agree with the majority opinion that Kofi Agyekum's plea was knowing and voluntarily. I also agree that the district court correctly concluded that Kofi Agyekum's activities related to the drug distribution conspiracy constituted "relevant conduct" for purposes of his sentencing, and that, relying on that conduct, the district court properly imposed a sentencing enhancement related to Kofi Agyekum's leadership role in the drug conspiracy. But I disagree that the district court properly enhanced Kofi Agyekum's sentence on the basis that he abused a position of trust. To the contrary, Kofi Agyekum did not have the trust relationship necessary to support the imposition of an abuse of a position of trust enhancement with either the West Virginia Board of Pharmacy or the distributor from which A+ Care Pharmacy purchased oxycodone. Therefore, I respectfully dissent as to Part II of the majority opinion.

As the majority opinion correctly states, a two-level enhancement for abuse of a position of trust is proper if "the defendant abused a position of public or private trust," U.S.S.G. § 3B1.3--that is, "a position . . . characterized by professional or managerial discretion," id. § 3B1.3 cmt. n.1. The defendant's abuse of a position of trust must be effected "in a manner that significantly facilitated the commission of the offense." Id. § 3B1.3. Moreover, "[w]hether a defendant

25

held a position of trust must be assessed from the perspective of the victim," United States v. Abdelshafi, 592 F.3d 602, 611 (4th Cir.), cert. denied, 562 U.S. 874 (2010), and "[t]here must be a trust relationship between [the defendant] and his victim for the enhancement to apply," United States v. Moore, 29 F.3d 175, 180 (4th Cir. 1994) (alteration in original) (emphasis added) (internal quotation marks omitted).

"[W]e generally weigh three factors to determine whether a particular defendant abused a position of trust, including (1) whether the defendant had special duties or special access to information not available to other employees, (2) the extent of the discretion the defendant possessed, and (3) whether the defendant's actions indicate that he is more culpable than others in similar positions who engage in criminal acts." Abdelshafi, 592 F.3d at 611. Under this test, establishing a trust relationship "requires more than a mere showing that the victim had confidence in the defendant. Something more akin to a fiduciary function is required." United States v. Ebersole, 411 F.3d 517, 536 (4th Cir. 2005) (quoting United States v. Caplinger, 339 F.3d 226, 237 (4th Cir. 2003)) (internal quotation marks omitted).

Here, the majority opinion identifies the West Virginia Board of Pharmacy and the pharmacy's distributor as the victims of Kofi Agyekum's abuse of a position of trust. Ante, at 21.

The majority opinion, however, fails to establish that a trust relationship existed between Kofi Agyekum and either the Board of Pharmacy or the distributor. Regarding the Board of Pharmacy, as a "Pharmacy Intern," Kofi Agyekum was "licensed to engage in the practice of pharmacist care while under the supervision of a pharmacist." W. Va. Code § 30-5-4 (emphasis added). Accordingly, Kofi Agyekum's state licensure expressly deprived Kofi Agyekum of managerial discretion and placed supervisory and discretionary authority in his pharmacist supervisor--here, Patricia Agyekum. Indeed, West Virginia law renders Kofi Agyekum's authority with regard to the dispensing of pharmaceuticals entirely derivative of Patricia Agyekum, as Kofi Agyekum's pharmacist supervisor. See W. Va. Code § 30-5-4(51) ("'Pharmacist-in-charge' means a pharmacist currently licensed in this state who accepts responsibility for . . . the distribution of drugs and who is personally in full charge of the pharmacy and pharmacy personnel.").

To that end, West Virginia law entrusts pharmacists-in-charge, like Patricia Agyekum--not Pharmacy Interns, like Kofi Agyekum--with the responsibility of complying with state and federal laws and preventing the diversion of prescription pharmaceuticals. See, e.g., W. Va. Code § 30-5-4(51) (providing that the pharmacist-in-charge is responsible "for the operation of a pharmacy in conformance with all laws and legislative

27

rules . . . and the distribution of drugs"); W. Va. Code § 30-5-23(b) ("The pharmacist-in-charge is responsible for the pharmacy's compliance with state and federal pharmacy laws and regulations and for maintaining records and inventory."); W. Va. Code R. § 15-1-20(3.2.2) ("The pharmacist-in-charge shall notify the pharmacy permit holder of potential violations of any statute, rule or court order existing within the pharmacy. If appropriate action has not been taken within a reasonable amount of time the pharmacist-in-charge shall reduce to writing the above and submit to the pharmacy permit holder with a copy to the Board."); W. Va. Code R. § 15-1-20(3.2.8) (providing that the pharmacist-in-charge is responsible for "[m]aking or filing any reports required by state or federal laws, rules, and regulations"). The Board of Pharmacy, therefore, entrusted Patricia Agyekum--as pharmacist-in-charge--with special duties and responsibilities, not Kofi Agyekum--a Pharmacy Intern under her supervision.

Accordingly, a trust relationship existed <u>between the Board of Pharmacy and Patricia Agyekum</u>, as the pharmacist-in-charge and Kofi Agyekum's supervisor, not between the Board of Pharmacy and Kofi Agyekum. Patricia Agyekum may have abused the trust the Board of Pharmacy placed in her by allowing Kofi Agyekum to illegally dispense oxycodone and by failing to report the loss of oxycodone from A+ Care Pharmacy's inventory. However,

28

Patricia Agyekum's abuse of her relationship of trust with the Board of Pharmacy does not serve as a basis to enhance Kofi Agyekum's sentence. Moore, 29 F.3d at 179 (holding that a defendant's sentence cannot be enhanced on grounds of a co-conspirator's abuse of a position of trust).

There is also no evidence of a trust relationship between Kofi Agyekum and the distributor from which A+ Care Pharmacy purchased oxycodone. Because something "akin to a fiduciary function" is required to create a trust relationship, Ebersole, 411 F.3d at 536, "an ordinary commercial relationship between the perpetrator and victim is insufficient to support the abuse of trust enhancement," United States v. Akinkoye, 185 F.3d 192, 204 (4th Cir. 1999) (citing Moore, 29 F.3d at 178); see also, e.g., United States v. Septon, 557 F.3d 934, 937 (8th Cir. 2009) (finding that "an arms-length commercial relationship will ordinarily not suffice for the [abuse-of-trust] enhancement to apply"). Accordingly, Kofi Agyekum's purchase of oxycodone on A+ Care Pharmacy's behalf cannot, by itself, create a trust relationship between Kofi Agyekum and the distributor or, accordingly, amount to an abuse of a position of trust.

The district court rightly noted that Kofi Agyekum could purchase oxycodone and other controlled substances from the distributor only through use of Patricia Agyekum's Drug Enforcement Administration Registration Number ("DEA Number").

29

But this amounts to nothing more than evidence that the distributor placed trust in Patricia Agyekum--the holder of the DEA Number and the individual authorized to dispense controlled substances--not in Kofi Agyekum.  Again, that Patricia Agyekum may have abused the distributor's trust by allowing Kofi Agyekum to use her pharmacist license and DEA Number to order oxycodone does not support enhancing Kofi Agyekum's sentence.  Moore, 29 F.3d at 179.  Therefore, Kofi Agyekum's use of Patricia Agyekum's DEA Number to place orders with the distributor does not establish a trust relationship between Kofi Agyekum and the distributor and, thus, cannot support a sentencing enhancement based upon abuse of a position of trust.

In sum, a trust relationship did not exist between Kofi Agyekum and the Board of Pharmacy or between Kofi Agyekum and the distributor.  The district court, therefore, erred in imposing the enhancement for abuse of a position of trust. Accordingly, I respectfully dissent.