PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-4039

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ARTHUR SANFORD WEISS,

Defendant - Appellant.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. Thomas D. Schroeder, District Judge. (1:12-cr-00249-TDS-1)

Argued: March 20, 2014                     Decided: June 6, 2014

Before NIEMEYER and DIAZ, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Senior Judge Hamilton wrote the opinion, in which Judge Niemeyer and Judge Diaz joined.

**ARGUED:** Charles LeRoy White, II, Greensboro, North Carolina, for Appellant. Todd Alan Ellinwood, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Ripley Rand, United States Attorney, Clifton T. Barrett, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.

HAMILTON, Senior Circuit Judge:

On appeal, Arthur Weiss (Weiss) challenges his 185-month sentence, following his plea of guilty to one count of wire fraud, 18 U.S.C. § 1343, one count of money laundering, id. § 1957, one count of making a false statement on a loan application to a financial institution, the accounts of which are insured by the Federal Deposit Insurance Corporation (FDIC), id. § 1014, and one count of corrupt interference with the internal revenue laws of the United States, 26 U.S.C. § 7212(a). We affirm.

I.

The following facts either underlie the counts to which Weiss pled guilty or constitute relevant conduct for sentencing purposes.

From sometime in 2003 until mid-2012, Arthur Weiss (Weiss) owned and operated several professional employer organizations in North Carolina. A professional employer organization (PEO) provides human resource functions, including payroll processing, for companies through employee leasing agreements. Under North Carolina law, PEOs are required to be licensed and regulated by the North Carolina Department of Insurance. North Carolina Professional Employer Organization Act, N.C. Gen. Stat. §§ 58-89A-1 to 180.

During this time frame, Weiss falsely held himself out as a Certified Public Accountant by using the initials "CPA" on his letterhead, on his business cards, and in his email address (artweisscpa@aol.com). The record also contains evidence that Weiss provided a brochure to a potential client, whom he later acquired as an actual client, outlining the services offered by his PEO named Employee Alternatives, LLC (EA), including payroll processing, tax services, and securing workers' compensation insurance. The EA brochure stated that "[w]e deposit your payroll taxes, file payroll tax returns and assume full responsibility for the accuracy and timeliness of those processes." (J.A. 244) (internal quotation marks omitted). Other EA services included preparation and filing of Internal Revenue Service (IRS) Form 941 (Employer's Quarterly Federal Income Tax Return) and making deposits for federal unemployment insurance. In the EA brochure, Weiss listed himself as a CTA, which can stand for either "'Certified Tax Accountant'" or "'Chartered Tax Advisor," and listed himself as an ATA, which stands for "'Accredited Tax Advisor.'" Id.

Through his various PEO entities, at least twenty-two companies hired Weiss. Weiss collected funds from client companies to pay the wages of the companies' respective leased employees along with a fee for the payroll services. Weiss then deposited such funds into bank accounts he controlled. Weiss

then instructed third-party payroll companies to actually calculate the applicable state and federal income tax withholdings. The third-party payroll companies either paid the employees their net income directly or advised Weiss of the net amounts due; thereafter Weiss would disburse the net paycheck funds to the employees. On many occasions, Weiss failed to pay the state and federal withholdings deposited with his PEO entities to the IRS and relevant state revenue agencies, converting such funds to his own use.

Weiss also collected funds from his client companies to secure workers' compensation insurance for their leased employees, but failed to secure the level of coverage for which he collected premiums. He converted the excess premium payments to his own use.

Weiss stipulated for sentencing purposes that the losses attributable to him totaled $4,132,044.16 in unpaid federal employment taxes, $260,839.00 in unpaid state employment taxes, and $559,663.02 in unpaid workers' compensation insurance premiums.

Another Weiss scam involved a bank insured by the FDIC. Over time, Weiss established a close banking relationship with Branch Bank and Trust (BB&T). From 2002 until 2008, Weiss submitted false federal income tax returns to BB&T reflecting higher income figures for himself than he had actually reported

- 4 -

to the IRS.  In reliance upon these misrepresentations, between 2004 and 2008, BB&T approved four loans to Weiss, totaling $2,266,500.00, for the purchase of a lot and construction of a home in Marion, North Carolina.  The home securing such loans subsequently sold in bankruptcy proceedings for $1,350,000.00.

Weiss failed to report any of his illegally obtained income to the IRS.  He stipulated that the illegal income he should have declared on his federal income tax returns resulted in him underpaying personal income taxes in the amount of $1,093,813.00.

Weiss used a portion of the proceeds from his employment tax scheme to purchase expensive jewelry.  Between May 3, 2008 and May 11, 2008, Weiss and his wife traveled to Romania. During the trip, Weiss falsely reported to his insurance carrier that four pieces of jewelry with a total purchase price of $129,900.00 were lost or stolen.  He subsequently received a check, via the United States Postal Service, from his insurance carrier, for the appraised value of such jewelry--i.e., $177,480.00.  Law enforcement authorities subsequently located the same four items of jewelry in Weiss' home.


II.

The presentence report (PSR) calculated Weiss' total offense level under the United States Sentencing Guidelines (the

Guidelines or USSG) at 33 and his criminal history category at III, resulting in an advisory sentencing range of 168 to 210 months' imprisonment. Of relevance on appeal, the total offense level of 33 included a 2-level enhancement for abuse of a position of trust, pursuant to USSG § 3B1.3, to which Weiss objected. The district court overruled his objection.

Also of relevance on appeal, the total offense level of 33 set forth in the PSR included 20 levels for a loss of more than $7,000,000.00, but less than $20,000,000.00. See USSG § 2B1.1(b)(1)(K). Weiss objected to application of this loss range, contending that he is only accountable for $6,050,000.00 in losses, thus placing him in the loss range of more than $2,500,000.00, but less than $7,000,000.00. This loss range results in an 18 level increase in his offense level as opposed to 20. See USSG § 2B1.1(b)(1)(J). The district court overruled this objection also. The district court found the total amount of loss attributable to Weiss' offense conduct and relevant conduct to be $7,140,339.18.

Ultimately, the district court determined Weiss' advisory sentencing range under the Guidelines to be 168 to 210 months' imprisonment, and sentenced him to 185 months' imprisonment.

On appeal, Weiss challenges the procedural reasonableness of his sentence on the basis that the district court erred: (1) by increasing his offense level under the Guidelines by 2 levels

pursuant USSG § 3B1.3 for abuse of a position of trust; (2) by increasing his offense level under the Guidelines by 20 levels pursuant to USSG § 2B1.1(b)(1)(K), instead of by only 18 levels pursuant to USSG § 2B1.1(b)(1)(J); and (3) by failing sua sponte to appoint various experts to assist in his defense at sentencing. We address each of these assignments of error in turn.

III.

USSG § 3B1.3 provides for a 2-level enhancement in the defendant's offense level if the defendant "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense . . . ." USSG § 3B1.3. The applicable commentary identifies a position of trust as a role "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." USSG § 3B1.3, comment. (n.1). The abuse-of-trust enhancement also applies to imposters, so long as the imposter-defendant "provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust." United States v. Brack, 651 F.3d 388, 392-93 (4th Cir. 2011) (internal quotation marks omitted). "This is so because [i]n making the misrepresentation, the defendant assumes a position

- 7 -

of trust, relative to the victim, that provides the defendant with the same opportunity to commit a difficult-to-detect crime that the defendant would have had if the position were legitimately held."  Id. at 393 (internal quotation marks omitted).

Three factors guide the sentencing court in determining whether a person held a position of public or private trust for purposes of applying the USSG § 3B1.3 enhancement:  (1) whether the defendant had special duties or access to information not available to other employees; (2) the extent of the defendant's discretion; and (3) whether the defendant's acts indicate that he is more culpable than similarly situated actors.  Id.  The commentary to USSG § 3B1.3 also provides specific examples of when the defendant's abuse of a position of trust justifies application of the enhancement:  "an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination."  USSG § 3B1.3, comment. (n.1).  In contrast, the same commentary provides that the "adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors."  Id.

Here, in concluding Weiss should receive a USSG § 3B1.3 enhancement for abuse of a position of trust, the district court found the following facts: (1) Weiss held himself out to be a CPA; (2) CPAs have substantial discretionary judgment in making determinations as to how to properly engage in the various computations and decisions necessary to properly account for and pay the various payroll taxes at issue in the present case and most persons would regard CPAs to be regulated by the state; (3) Weiss' holding himself out as a CPA significantly facilitated his fraud scheme by "g[iving] him certain credential with people in business who would be willing to give him such type of business and have him provide the services that one would imagine that a [CPA] would faithfully and properly provide"; and (4) Weiss' holding himself out as a CPA significantly facilitated the commission and concealment of his fraud scheme by allowing him to manage payroll functions, including the payment of state and federal tax withholdings to the proper government agencies, "without any oversight." (J.A. 154).

We review the factual findings underlying the district court's USSG § 3B1.3 enhancement for clear error. United States v. Dawkins, 202 F.3d 711, 714 (4th Cir. 2000). To the extent the district court undertook a legal interpretation of USSG § 3B1.3, our review is de novo. United States v. Gormley, 201 F.3d 290, 296 (4th Cir. 2000).

- 9 -

On appeal, Weiss concedes the government presented evidence at sentencing that he used the CPA designation in many of his business documents and on his business cards, and thus, "it may be reasonable to infer that he held himself out as a CPA to at least some of the victims." (Weiss' Opening Br. at 9). However, Weiss contends that a USSG § 3B1.3 enhancement is inapplicable in his case because "there was no evidence adduced in any form that his false representation of himself as a CPA induced any of these victims to do business with him or caused them to repose a higher level of trust or confidence in him whatsoever." Id. In Weiss' view, he merely provided payroll and insurance agent services to his victim corporations and did not act as their CPAs.

In support of his position, Weiss primarily relies upon our decision in United States v. Caplinger, 339 F.3d 226 (4th Cir. 2003). The defendant in Caplinger misrepresented himself as an accomplished physician in his efforts to attract investors in his fraudulent schemes involving production of a fake wonder drug used to treat HIV/AIDS. Id. at 229-30. In determining the defendant's offense level under the Guidelines, the district court assessed a 2-level enhancement pursuant to USSG § 3B1.3 for abuse of a position of trust. Id. at 235. The defendant challenged the enhancement on appeal.

On appeal, we framed the issue as "whether Caplinger, by posing as an accomplished physician in order to influence potential investors, abused a position of trust with respect to the victims of his fraud scheme within the meaning of" USSG § 3B1.3. Id. at 236. In answering this question in the negative, we reasoned that while the false information about the defendant's credentials and experience assisted in convincing investors and in making them more confident about their investment, any trust the investors placed in the defendant was not based on a special relationship he had with them as a physician, but on their misplaced belief in the misrepresentations about his credentials and the fake wonder drug's potential for success. Id. at 237. As a result, we vacated the defendant's sentence and remanded for resentencing without the USSG § 3B1.3 enhancement. Id. at 238.

Weiss contends that the argument for applying the enhancement in Caplinger is stronger than in his case because the sentencing court in Caplinger found that the defendant's misrepresentations induced the victims to invest in his fraudulent scheme, while in Weiss' case, the record contains no evidence that falsely holding himself out as a CPA induced any victim to participate in any of his schemes in any way.

The government distinguishes Caplinger on the basis that, in Caplinger, the defendant participated in an arms-length

- 11 -

transaction with each of his victims as opposed to entering into a fiduciary or personal trust relationship with his victims as Weiss did.

The primary case upon which the government relies in support of its position is Brack. In Brack, the defendant Tiffanie Brack (Brack) posed as a bail bondsman at a North Carolina jail in order to secure identifying information, cash, and the title to two properties from an elderly gentleman attempting to post bond for his granddaughter. 651 F.3d at 389. Brack pled guilty to one count of wire fraud and one count of aggravated identity theft. In sentencing Brack, the district court applied a USSG § 3B1.3 enhancement for abuse of a position of trust based upon Brack's purported position as a bail bondsman. Id. at 390.

Brack unsuccessfully challenged the enhancement on appeal. On appeal, we first concluded that a bail bondsman in North Carolina holds a position of public trust leading to the assumption of certain fiduciary duties to their clients. Id. at 394. Second, we concluded that Brack's purported position as a bail bondsman significantly contributed to the commission or concealment of her offenses because the position "provide[d] a seemingly valid basis for her to make initial contact with [the victim grandfather] at the jail, [and] it also allowed Brack to

secure [the victim grandfather's] identifying information without revealing her criminal intent." Id. at 395.

The government argues that the relevant facts in the present case are on all fours with Brack in that (1) Weiss represented himself throughout the course of his unlawful activity as being a CPA, thus providing his victims sufficient indicia that he was trustworthy and qualified to handle their payroll processing, and (2) Weiss' misrepresentations about being a CPA created trust relationships with his clients which allowed him to manage the gross payroll of several large companies virtually unchecked.

We uphold the district court's 2-level enhancement in Weiss' offense level pursuant to USSG § 3B1.3 for abuse of a position of trust. "[T]he central purpose of § 3B1.3 is to penalize defendants who take advantage of a position that provides them with the freedom to commit a difficult-to-detect wrong." Id. at 393 (internal quotation marks and alteration marks omitted). Here, there is more than sufficient evidence in the record from which a reasonable person could infer that Weiss had a trust relationship with at least one of his victim-companies which provided him with the freedom to commit a difficult-to-detect wrong. While all payroll processing companies are not headed up by a CPA, when a CPA does head up a payroll processing company, with the attendant required

- 13 -

calculations for tax withholding and payments over to the IRS and applicable state agency, the client company reasonably believes that it has hired a licensed professional in the accounting/tax field to ensure the proper processing of its payroll liabilities and responsibilities. Weiss only had to take advantage of his trust relationship with one client on one occasion in order for the enhancement to apply. This fact is easily inferred from the record evidence.

Caplinger is materially distinguishable on the basis that the defendant in Caplinger did not have a trust relationship with any of his investor victims. The present case is analogous to Brack in the sense that we can infer from the evidence in the present case that Weiss was able to perpetrate his fraud, at least in part, because of a trust relationship with at least one of his victim companies.

In sum, the district court did not err in increasing Weiss' offense level by 2 levels pursuant to USSG § 3B1.3 for abuse of a position of trust.

IV.

We now turn to Weiss' challenge to the district court's loss calculation under the Guidelines. In calculating Weiss' offense level under the Guidelines, the district court found the amount of pecuniary harm foreseeable to Weiss with respect to

his offense conduct and all relevant conduct to be $7,140,339.18. This amount added 20 levels to Weiss' base offense level of 7 for a loss greater than $7,000,000.00, but less than $20,000,000.00. USSG § 2B1.1(b)(1)(K). The district court reached this figure by finding as follows: (1) Weiss failed to pay the IRS $4,132,044.16 in employment taxes that he collected from his client companies' payrolls; (2) Weiss failed to pay $260,839.00 in state taxes for his client companies; (3) Weiss failed to pay $559,663.02 in workers' compensation premiums for his client companies; (4) Weiss fraudulently obtained an insurance check of $177,480.00; (5) Weiss defrauded BB&T of $916,500.00; and (6) Weiss owes $1,093,813.00 in personal federal income tax on his illegal gains that he knowingly and intentionally failed to report on his federal income tax returns.

Below, Weiss did not take issue with the district court's total loss figure up to $6,046,526.18, which amount would have added 18, as opposed to 20 levels to his base offense level of 7 for a loss greater than $2,500,000.00, but less than $7,000,000.00. USSG § 2B1.1(b)(1)(J); see also (J.A. 121) (Weiss's attorney at sentencing: "[H]e is admitting or conceding to 18 additional levels."). Weiss also did not take issue with the district court's finding that he owes $1,093,813.00 in personal federal income taxes on his illegal income. Weiss did,

however, take issue with the district court's inclusion of the $1,093,813.00 amount as part of the total loss calculation with respect to USSG § 2B1.1(b)(1). Weiss argued below that "the income tax due on illegal gain cannot be included in the total loss determination in addition to the illegal gain under [USSG] § 2B1.1(b)(1) without case authority or specific guideline authority." (J.A. 285). Weiss reasoned that because the commentary to USSG § 2T1.1 (the Guideline specifically pertaining to offenses involving taxation), expressly provides for the counting of personal income tax due on illegally obtained income derived from a defendant's underreporting of corporate income with respect to a Subchapter C corporation which he solely owns, the absence of such express commentary in USSG § 2B1.1 means that the United States Sentencing Commission did not intend to include personal income taxes on illegally obtained income as part of the loss calculation under USSG § 2B1.1(b)(1).

At sentencing below, the district court overruled Weiss' objection to including the $1,093,813.00 in personal federal income tax due on his illegal gains as part of the total loss figure under USSG § 2B1.1(b)(1) because the plain language of USSG § 2B1.1 and its accompanying commentary allows for such inclusion. In this regard, the district court relied upon Application Note 3(A)(iv) to USSG § 2B1.1, which provides that,

- 16 -

for purposes of determining the loss under USSG § 2B1.1(b)(1), "'reasonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known was a potential result of the offense." USSG § 2B1.1, comment. (n.3(A)(iv)). Consistent with the plain language of this commentary, the district court counted both (1) the pecuniary harm to Weiss' client companies resulting from Weiss' failure to pay the payroll taxes due on his clients' payroll and (2) the individual federal income taxes due from Weiss on such illegally obtained gains because Count 35, charging Weiss with corrupt interference with internal revenue laws in violation of 26 U.S.C. § 7212(a), alleged separate overt acts of Weiss keeping the payroll taxes for himself and then filing individual federal income tax forms without declaring such illegally obtained funds as personal income. In this regard, the district court specifically stated:

> The defendant committed frauds on other individuals and companies, and he also defrauded the government in the process by not paying tax on the money that he defrauded others out of. Those are two separate losses, and it seems appropriate to calculate both as a part of the loss amount, particularly where he is charged with both. If I were not to do that, then he would be getting the benefit of a lower guideline range that does not fully incorporate the loss that was both intended and which occurred in this case.

(J.A. 115-16).

- 17 -

As for Weiss' argument with regard to the commentary in USSG § 2T1.1, the district court rejected it on the ground that the United States Sentencing Commission added such commentary as a clarifying amendment in response to a circuit split on the issue of whether a defendant's personal income taxes due on illegally obtained income should count in the total loss calculation under USSG § 2T1.1, which means the United States Sentencing Commission intended all along for (1) the pecuniary harm resulting from a defendant's underreporting of corporate income with respect to a Subchapter C corporation which the defendant solely owns and (2) the pecuniary harm resulting from the defendant's failure to claim as individual income the funds he obtained from underreporting the corporate income to be counted as part of the pecuniary harm foreseeable to the defendant from his offense and relevant conduct. The district court concluded that, if anything, the clarifying amendment strengthened the case for counting the foreseeable loss to the government in the form of unpaid federal income taxes resulting from Weiss' failure to claim his ill-gotten gains as personal income on his federal income tax returns.

On appeal, Weiss continues to press this same line of argument he pressed below. Notably, Weiss did not cite a single case in support of his position below and does not do so in his

Opening Brief on appeal. He also does not address this issue at all in his Reply Brief on appeal.

The government's argument in response essentially tracks the reasoning of the district court. Additionally, the government points out that the Guidelines' grouping rules support the district court's inclusion of Weiss' personal income liability on his unreported illegally obtained income: "'In the case of counts grouped together pursuant to § 3D1.2(d), the offense level applicable to a Group is the offense level corresponding to the aggregated quantity, determined in accordance with Chapter Two and Parts A, B and C of Chapter Three.'" (government's Br. at 47) (quoting USSG § 3D1.3(b)). USSG § 3D1.2(d) applies when the offense level, as in the present case, is determined largely on the basis of the total amount of harm or loss.

We find Weiss' position wholly unpersuasive. First, Weiss' position ignores the plain language of the relevant Guideline sections and their corresponding commentary, including the relevant definition for pecuniary harm in Application Note 3(A)(iv) to USSG § 2B1.1 and USSG § 3D1.3(b)'s direction to aggregate the loss in the case of counts grouped together when the offense level is determined largely on the basis of the total amount of harm or loss. Second, the district court's reasoning in rejecting Weiss' argument regarding USSG § 2T1.1 is

on the money. The United States Sentencing Commission's addition of clarifying commentary to USSG § 2T1.1 in order to address a similar counting issue with respect to underreporting corporate income in no way supports Weiss' position on this issue. If anything, the commentary supports the district court's inclusion of Weiss' individual federal income tax liability for his ill-gotten gains on the basis that the United States Sentencing Commission views the tax loss to the federal government resulting from a defendant's failure to report illegally obtained income from an underlying tax related fraud as a separate and distinct harm from such underlying fraud. The crucial point is that the underlying offense is complete when a defendant fraudulently diverts income to himself, so that when the same defendant fails to report such fraudulently obtained income as income on his federal income tax return, a second and distinct offense is committed. That is the way the government charged Weiss in this case in Count 35 to which he pled guilty. Therefore, there is no merit to Weiss' position that he should not be held accountable for all of his offense conduct, including filing individual federal income tax returns in which he knowingly and intentionally failed to claim his illegally gotten gains as income.

In sum, the district court's loss figure with respect to determining Weiss' offense level under the Guidelines stands.

V.

In his last issue on appeal, Weiss claims the district court abused its discretion by failing sua sponte to appoint him various experts to assist in his defense at sentencing. According to Weiss, with respect to his sentencing, such failure denied him his rights to fundamental fairness, due process of law, and effective assistance of counsel because he did not have expert assistance to help him in at least four ways. First, Weiss claims that he needed the assistance of a tax expert to accurately assess and challenge the $1,093,813.00 figure in the PSR listed as the amount of personal income tax that he should have paid on his illegally obtained income.[*] According to Weiss' appellate attorney (different from his attorney below), Weiss "apparently felt compelled to stipulate to that amount, because he was unable to challenge it." (Weiss' Opening Br. at 18). Second, Weiss contends that he needed expert assistance to challenge the amount of the loss attributable to the loan fraud allegations pertaining to BB&T. Third, Weiss contends that he needed an expert witness to help him prove that his companies

---

[*] According to the PSR, "[t]his amount was calculated by an IRS agent using the defendant's bank records, tax returns, and paper and electronic documents seized during the May 26, 2010, search of his residence." (J.A. 253). The PSR went on to characterize the $1,093,813.00 figure as "a conservative figure allowing Defendant Weiss all allowable credits." Id.

- 21 -

were not, in fact, PEOs as defined under North Carolina law, such that he could have avoided a sentencing enhancement under USSG § 2B1.1(b)(10)(C) for using sophisticated means in the implementation of his scheme. Fourth and finally, Weiss contends that "common sense dictates that the sheer volume of records and the complex analyses upon which the government relied over the course of its four year investigation can only be effectively cataloged, analyzed and challenged with expert assistance." (Weiss' Opening Br. at 22).

As the government correctly contends, because Weiss never requested any of the expert assistance he now claims was critical to his ability to mount a successful defense at sentencing, our review is limited to reviewing for plain error. See Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 731-32 (1993). Under plain error review, an appellate court has the discretion to correct a forfeited error if: (1) there is error; (2) the error is plain (i.e., "'clear' or, equivalently, 'obvious,'"), Olano, 507 U.S. at 734; (3) the error affects the defendant's substantial rights; and (4) the appellate court determines, after examining the particulars of the case, that the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. Id. at 732-34.

Weiss' assignment of error regarding his need for experts to aid in his defense at sentencing does not survive plain error review. Assuming arguendo that Weiss can establish error as he has alleged (a big stretch in and of itself), there is absolutely no basis for us to conclude that such error is plain. See id. at 734 (noting that an error is plain if it is "'clear' or, equivalently, 'obvious'"). Accordingly, Weiss is entitled to no relief with respect to his argument on appeal regarding his need for expert assistance in preparing for his defense at sentencing, which need he never made known to the district court.

## VI.

For the foregoing reasons, we affirm Weiss' sentence in toto.

AFFIRMED