**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 24-4468

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

CHRISTON JERMAINE BREWER, a/k/a Chris Rozay, a/k/a Christian Massey,

Defendant – Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Max O. Cogburn, District Judge.  (3:22-cr-00164-MOC-SCR-1)

Argued:  September 10, 2025                Decided:  September 26, 2025

Before DIAZ, Chief Judge, and KING and RICHARDSON, Circuit Judges.

Affirmed by published opinion.  Judge King wrote the opinion, in which Chief Judge Diaz and Judge Richardson joined.

**ARGUED:**  Lauren B. Torre, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Las Vegas, Nevada, for Appellant.  Julia Kay Wood, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.  **ON BRIEF:**  Rene L. Valladares, Federal Public Defender, Jeremy C. Baron, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Las Vegas, Nevada, for Appellant.  Lawrence J. Cameron, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

KING, Circuit Judge:

Christon Jermaine Brewer appeals from a 33-month sentence imposed in August 2024 in the Western District of North Carolina. In June 2023, Brewer pleaded guilty — without a plea agreement — to a lone count of wire fraud, in contravention of 18 U.S.C. § 1343. The facts underlying that offense relate to a fraud scheme in which Brewer would swindle individual investors by pretending to be a wealthy and experienced investor who could guarantee significant financial returns. Instead of investing the money he obtained from the victim-investors, however, Brewer simply spent it on himself.

On appeal, Brewer challenges only his 33-month sentence. More specifically, Brewer attacks the sentencing court's application of a 2-level enhancement for abuse of trust, imposed pursuant to U.S.S.G. § 3B1.3 (the "abuse-of-trust enhancement"), along with the court's imposition of two conditions of supervised release. As explained herein, we are satisfied to reject each of Brewer's contentions of error and affirm the judgment.

I.

A.

In June 2022, a grand jury in the Western District of North Carolina returned an indictment charging Brewer with one count of wire fraud, in violation of 18 U.S.C. § 1343.

2

The indictment alleged that Brewer had defrauded "at least ten victim-investors . . . of over $150,000, by fraudulently inducing them to give him money." *See* J.A. 14.[1]

More specifically, the indictment alleged that Brewer falsely "represented himself to victim-investors as a wealthy and experienced investor" and "falsely represented that he would invest the victim-investors' funds in a manner with guaranteed returns . . . in the stock market and in a cannabis store he was opening in Miami, Florida." *See* J.A. 14. According to the indictment, however, Brewer "did not invest the victim-investors' funds but, instead, used them for various personal expenses to support his lifestyle." *Id.* To bolster his standing with the victim-investors, and to create an aura of legitimacy for his fraud scheme, Brewer would "sometimes provide victim-investors with Promissory Notes" to memorialize the investments and repayment dates. *Id.* The victim-investors would then turn over their funds to Brewer. And to cover his tracks, Brewer would "lull victim-investors into thinking they were making money on their investments by sending them text messages that provided purported updates on their investments." *Id.* at 15. When the victim-investors sought to cash out on their investments, Brewer made "various excuses as to why the investor-victim's money could not be withdrawn and returned." *Id.* at 166. For example, Brewer claimed "issues with the bank" prevented him from withdrawing funds. *Id.* In some instances, when pressed by his victim-investors, Brewer "would become

---

[1] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

3

hostile, threatening them via text messages, including on occasion threating to have someone kill the victim-investor." *Id.* at 167.

## B.

On June 23, 2023, Brewer pleaded guilty "straight up" — without a plea agreement — to the single wire fraud count alleged. To that end, the factual basis for Brewer's guilty plea specified that he had "misrepresented to investors that he would invest money provided on their behalf with guaranteed returns" and that "investments would be made in the stock market or in a cannabis store when they were not." *See* J.A. 38-39.

Of especial relevance in this appeal, the presentence investigation report ("PSR") recommended a 2-level enhancement for abuse of trust, pursuant to Guidelines section 3B1.3. That enhancement applies, *inter alia*, "[i]f the defendant abused a position of . . . private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." *See* U.S.S.G. § 3B1.3. Brewer timely objected to the PSR's recommendation of the abuse-of-trust enhancement. *See* J.A. 154.

## C.

During the sentencing proceedings in Charlotte on August 20, 2024, the government called Ms. Elliott, a Special Agent with the FBI, to testify regarding Brewer's wire fraud offense conduct and the abuse-of-trust enhancement. Agent Elliott testified that Brewer had "represented himself as a successful trader, a successful businessman," and that he had told his victim-investors that "he made a lot of money in the stock market and that he was opening up a cannabis store in Florida." *See* J.A. 63. Elliott confirmed that one of Brewer's

4

victim-investors "understood him to be a day trader." *Id.* at 67. And Elliott related that another victim "believe[d]" Brewer was a "stock market investor." *Id.* at 70.

Special Agent Elliott further testified that Brewer "referred to himself as a day trader to many of the victim investors" and that he "referred to himself as a financial advisor to at least one of the victim investors." *See* J.A. 77. Agent Elliott confirmed that Brewer — who recurrently "held himself out as wealthy" to the victim-investors — told the victim-investors that he was "making a lot of money doing trades" and "investing in stocks." *Id.*

Along these lines, Special Agent Elliott confirmed that Brewer provided the victim-investors with regular updates on how their stocks were doing, and gave them "formal documents" including a "promissory agreement" and a "silent partnership agreement." *See* J.A. 78. Elliott explained that when the victim-investors asked for their returns on investments managed by Brewer, he would provide a "variety of reasons" as to why he could not send them money, including that the "bank was closed," the bank "couldn't process wires over the weekend," or that he had "reached transfer limits." *Id.* at 65.

Several of the victim-investors also testified during the proceedings in the sentencing court. For instance, one victim-investor explained that "Brewer promoted himself as a legitimate financial investor." *See* J.A. 124. Another victim-investor described Brewer's "baiting" of her "with phone recordings stating that he has millions in his bank account," and that he "showed" her "all of his investment stocks." *Id.* at 126.

Following the prosecution's evidence in support of the abuse-of-trust enhancement, Brewer allocuted before the judge, during which he acknowledged that he "took people's trust" and "let them down." *See* J.A. 115 (Brewer: "I was a liar, and I took people's trust,

5

and I let them down").  Despite those specific admissions, Brewer's lawyer objected to application of a 2-level abuse-of-trust enhancement, as recommended by the PSR.

Over Brewer's objection, the sentencing court applied the abuse-of-trust enhancement, increasing Brewer's total offense level from 16 to 18.  Accordingly, the 2-level abuse-of-trust enhancement altered Brewer's Guidelines sentencing range from 21 to 27 months to 27 to 33 months.  The court then imposed a high-end term of 33 months in prison, to be followed by three years of supervised release.

As part of Brewer's sentence, the sentencing court also imposed, inter alia, two discretionary conditions of supervised release — that is, Supervised Release Conditions 17 and 22.  For its part, Condition 17 provides that Brewer

> shall participate in a program of testing for substance abuse . . . [and] refrain from obstructing or attempting to obstruct or tamper, in any fashion, with the efficiency and accuracy of the testing. The defendant shall participate in a substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise the defendant's participation in the program (including, but not limited to, provider, location, modality, duration, intensity) (unless omitted by the Court).

*See* J.A. 144.  Meanwhile, Supervised Release Condition 22 spells out that Brewer

> shall participate in transitional support services (including cognitive behavioral treatment programs) and follow the rules and regulations of such program. The probation officer will supervise the defendant's participation in the program (including, but not limited to, provider, location, modality, duration, intensity). Such programs may include group sessions led by a counselor or participation in a program administered by the probation officer.

*Id.*  Notably, Brewer did not object to either condition of supervised release at sentencing.

Brewer timely noticed this appeal on August 29, 2024, and we possess jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

6

II.

On appeal, Brewer primarily challenges the sentencing court's application of the 2-level abuse-of-trust enhancement. Brewer maintains that the enhancement applies only when a defendant has maintained a "fiduciary-type relationship with the victims," and that Brewer did not perform a "fiduciary function" for his victims. *See* Br. of Appellant 8-19. In the alternative, Brewer argues that the enhancement does not apply here because "he wasn't a legitimate financial advisor working for an investment brokerage firm but was instead an individual who simply pretended to be a skilled investor." *Id.* at 19. In other words, the abuse-of-trust enhancement does not apply to "a mere imposter." *Id.* In his challenge to the conditions of supervised release — i.e., Supervised Release Conditions 17 and 22 — Brewer maintains that each is an illegal and improper delegation of the sentencing court's judicial authority to a Probation Officer, in contravention of Article III of the Constitution. We will address and reject each of Brewer's contentions in turn.

A.

We begin with Brewer's challenge to the sentencing court's application of the 2-level abuse-of-trust enhancement. As our Court has recognized, "[w]hether a defendant occupied a position of trust warranting a [2]-level enhancement under U.S.S.G. § 3B1.3 is a factual determination reviewable for clear error." *See United States v. Glymph*, 96 F.3d 722, 727 (4th Cir. 1996); *United States v. Bollin*, 264 F.3d 391 (4th Cir. 2001), *overruled on other grounds by United States v. Chamberlain*, 868 F.3d 290 (4th Cir. 2017) (en banc). That is, a sentencing court's determination to apply the abuse-of-trust enhancement —

7

which is necessarily a "sophisticated factual determination" — will be reversed "only if clearly erroneous." *See United States v. Gordon*, 61 F.3d 263, 269 (4th Cir. 1995) (internal quotation marks omitted). To the extent the court "undertook a legal interpretation of" the abuse-of-trust enhancement under the Sentencing Guidelines, we are obliged to review that interpretation de novo. *See United States v. Weiss*, 754 F.3d 207, 212 (4th Cir. 2014) (internal quotation marks omitted).[2]

### 1.

Pursuant to the Sentencing Guidelines, "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense," the defendant's base offense level is increased

---

[2] Brewer suggests that we "should decide de novo whether the [abuse-of-trust enhancement] applies." *See* Reply Br. of Appellant 2. In advancing that argument, Brewer relies on *United States v. Barringer*, 25 F.4th 239 (4th Cir. 2022), where a panel of this Court acknowledged "the conflicting precedent on the standard of review for this inquiry." *Id.* at 255 (comparing *United States v. Ebersole*, 411 F.3d 517, 535-36 (4th Cir. 2005) ("We review de novo the [sentencing] court's legal interpretation of what constitutes 'a position of trust' under § 3B1.3."), with *United States v. Smith*, 353 Fed. App'x 869, 872 (4th Cir. 2009) ("The [sentencing] court's decision that a defendant had a position of trust is a factual determination reviewed for clear error." (citing *Bollin*, 264 F.3d at 415)).

Although *Barringer* declined to reconcile this apparent conflict because the defendant's arguments failed under either standard of review, we are satisfied to simply apply the framework recognized by this Court: "[t]he [sentencing] court's factual findings underlying sentencing enhancements are reviewed for clear error," and any attendant "legal interpretations are reviewed de novo." *See Bollin*, 264 F.3d at 415; *Ebersole*, 411 F.3d at 535-36 ("We review de novo the [sentencing] court's legal interpretation of what constitutes 'a position of trust' under § 3B1.3, and we review its factual findings for clear error"). And doing so is readily consistent with our obligations under *McMellon v. United States*, wherein our en banc Court recognized that an earlier published panel decision "must be followed, unless and until it is overruled by this court sitting en banc or by the Supreme Court." *See* 387 F.3d 329, 334 (4th Cir. 2004) (en banc).

"by 2." *See* U.S.S.G. § 3B1.3. As our Court has recognized, the "central purpose" of the abuse-of-trust enhancement "is to penalize[] defendants who take advantage of a position that provides them with the freedom to commit a difficult-to-detect wrong." *See United States v. Brack*, 651 F.3d 388, 393 (4th Cir. 2011) (internal quotation marks omitted).

For the abuse-of-trust enhancement to apply, "there must be a *trust relationship* between [a defendant] and his victim," which the defendant "abuses by taking advantage of [the relationship] to perpetrate or conceal the offense." *See United States v. Agyekum*, 846 F.3d 744, 753 (4th Cir. 2017) (emphasis added) (internal quotation marks omitted). Such a relationship "requires more than a mere showing that the victim had confidence in the defendant," insofar as "[s]omething more akin to a fiduciary function is required." *See Ebersole*, 411 F.3d 517, 536 (4th Cir. 2005) (quoting *United States v. Caplinger*, 339 F.3d 226, 237 (4th Cir. 2003)). Put differently, we have emphasized that "an ordinary commercial relationship between the perpetrator and victim is insufficient to support [application of] the abuse of trust enhancement." *See United States v. Akinkoye*, 185 F.3d 192, 203 (4th Cir. 1999) (citing *United States v. Moore*, 29 F.3d 175, 178 (4th Cir. 1994)).

Furthermore, the Commentary to Guidelines section 3B1.3 — at Application Note 3 — states that the abuse-of-trust enhancement may be applied by a sentencing court "in a case in which the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does

9

not." *See* U.S.S.G. § 3B1.3, cmt. 3.[3] Our Court has heretofore blessed applications of the abuse-of-trust enhancement to imposters so long as the defendant "provide[d] sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust." *See Brack*, 651 F.3d at 392-93 (internal quotation marks omitted); *see also, e.g., Bollin*, 264 F.3d at 416; *Weiss*, 754 F.3d at 213-14. As the *Brack* opinion explained,

> [t]his is so because [i]n making the misrepresentation [to the victim], the defendant assumes a position of trust, relative to the victim, that provides the defendant with the same opportunity to commit a difficult-to-detect crime that the defendant would have had if the position were legitimately held.

*See* 651 F.3d at 393 (internal quotation marks omitted).

Importantly, we have "rejected a mechanistic approach to the abuse of trust enhancement that excludes defendants from consideration based on their job titles." *See Akinkoye*, 185 F.3d at 203. Rather, the relevant inquiry calls for "an individualized determination of each defendant's culpability." *See United States v. Moore*, 29 F.3d 175, 179 (4th Cir. 1994). And in assessing individual culpability in the context of the enhancement, a sentencing court is obliged to do so from "the perspective of the victim," not the defendant. *See United States v. Abdelshafi*, 592 F.3d 602, 611 (4th Cir. 2010).

---

[3] Application Note 3 of Guidelines section 3B1.3 provides us with an "example" of when the abuse-of-trust enhancement should apply: when "a defendant . . . perpetrates a financial fraud by leading an investor to believe the defendant is a legitimate investment broker." *See* U.S.S.G. § 3B1.3, cmt. 3.

10

2.

a.

Against this backdrop, the sentencing court did not err in applying the abuse-of-trust enhancement to Brewer. There was more than sufficient evidence for the court to find that Brewer had a private trust relationship with his victim-investors. And that relationship gave Brewer an opportunity to commit a difficult-to-detect crime. In that context, the court's application of the abuse-of-trust enhancement was appropriate.

i.

For starters, the evidence presented in the sentencing proceedings demonstrated that Brewer held himself out to victim-investors as an experienced investor and financial advisor. And Brewer utilized that fabricated position — which we see as creating a relationship strongly "akin" to a "fiduciary function," *see Caplinger*, 339 F.3d at 237 — to facilitate his extensive fraud scheme. Indeed, there is no genuine dispute that Brewer was *entrusted* with hard-earned money from his victim-investors. *See* J.A. 14. Instead of investing these entrusted funds — as Brewer promised and guaranteed to his victim-investors — Brewer simply "support[ed] his lifestyle." *Id.* at 15.

Along these lines, Agent Elliott established that Brewer had "represented himself [to the victim-investors] as a successful trader" and "a successful businessman." *Id.* at 62. Brewer represented to his victim-investors that he was a "day trader," a "stock market investor," and a "financial advisor," as part of his fraud scheme. *Id.* Furthermore, when the victim-investors sought their promised money from Brewer, he made excuses. Those excuses included lies and false statements, such as the bank's shortage of cash, *see* J.A.

11

166; "holiday closures," *id.* at 65; the limits on electronic money transferring services, *id.* at 84; and his own "business trips," *id.* at 84. And to account for such "delays" in his remittance of payments, Brewer promised his victim-investors higher returns. *Id.* at 166.

In addition to Brewer's falsifications regarding his professional qualifications, the victim-investors gave Brewer significant discretion to decide how to invest the entrusted funds. *See* Br. of Appellant 17 (recognizing that Brewer "told the victims 'he would invest their money either (1) in a particular stock *or* stocks, *including*, Apple, Tesla, Amazon, and Moderna . . . or (2) in a cannabis store he was opening'" (emphasis added)). And the fact that Brewer was accorded such "significant discretion" by the victim-investors to make such investments strongly supports the sentencing court's application of the abuse-of-trust enhancement. *See Barringer*, 25 F.4th at 257.

Perhaps most tellingly, however, is Brewer's *own* allocution at his sentencing, which confirms that he viewed himself as occupying a position of private trust vis-à-vis his victim-investors. Brewer directly admitted to the sentencing court that he "took people's trust" and "let them down" in the process. *See* J.A. 115. Coupled with Agent Elliott's testimony and other evidence, there was a solid basis for the court to find that Brewer had maintained a "trust relationship . . . [with] his victim[s]" that he used "to perpetrate or conceal the [fraud] offense." *See Agyekum*, 846 F.3d at 753.

ii.

We are also entirely unpersuaded by Brewer's reliance on the Eleventh Circuit's decision in *United States v. Mullens*, 65 F.3d 1560 (11th Cir. 1995). In that prosecution, Mullens recruited investors into a Ponzi scheme through his country club connections. *Id.*

12

at 1566. Importantly, the court of appeals recognized that there was no evidence suggesting that Mullens had a "special, close, or personal attachment, or fiduciary relationship" with any members of the country club. *Id.* Reversing the trial court's application of the abuse-of-trust enhancement under Guidelines section 3B1.3, the court aptly explained that "[c]ountry club membership is often used as an avenue to develop business contacts," and Mullens — who did not hold himself out "as an investment broker" or otherwise provide "victims [with] objective indicia of such a role" — was not in a "position of trust" simply by "developing ordinary social relationships." *Id.* at 1566-67.

Here, by contrast, Brewer created the untruthful impression that he was a legitimate "day trader" and a "financial advisor." *See* J.A. 67. He gave his victim-investors "objective indicia" of such a position, and he falsified "promissory agreement" and "silent partnership agreement" documents to bolster his façade of legitimacy with his victim-investors. *Id.* at 77, 78. Simply put, *Mullens* is inapposite and unhelpful. Brewer's relationships with the victim-investors were far more than "an ordinary commercial relationship between . . . perpetrator and victim." *See Akinkoye*, 185 F.3d at 203. Rather, his situation is more akin to the facts of our *Bollin* case, where we upheld an abuse-of-trust enhancement that was applied to defendants who held themselves out to their victims "as having a high level of skill and experience in debentures trading" and who "caused the impression" that they were "legitimate, experienced debentures trader[s]" to be passed on to their victims. *See* 264 F.3d at 416.

13

b.

Resisting the sentencing court's straightforward conclusion against him, Brewer maintains that the abuse-of-trust enhancement does not apply to him because Guidelines section 3B1.3's text does not apply to mere "imposters." Brewer argues he did not occupy "a bona fide position as a financial advisor and was a mere imposter," such that the able district judge legally erred in applying that enhancement. *See* Br. of Appellant 19. As Brewer sees it, he "wasn't a legitimate financial advisor working for an investment brokerage firm." *Id.* He was only "an individual who simply pretended to be a skilled investor." *Id.*

To support his flawed contention, Brewer also relies on our Court's 2022 decision in *United States v. Campbell*, 22 F.4th 438 (4th Cir. 2022).[4] More specifically, Brewer argues that *Campbell* undermined our Court's earlier decision in *United States v. Weiss*,

---

[4] Although Brewer objected to the abuse-of-trust enhancement in the 2024 sentencing proceedings, *see* J.A. 157 (Brewer objecting to PSR's inclusion of abuse-of-trust enhancement); *id.* at 208 (Brewer objecting to "factually and legally unsupported . . . [abuse-of-trust enhancement]"), he did not raise any *Campbell*-related contentions regarding Guidelines section 3B1.3, even though *Campbell* had been decided by our Court in 2022. On appeal, the prosecutors do not quarrel with Brewer's assertion that we should review his *Campbell*-related contention de novo. *See* Br. of Appellee 13 (recognizing that "Brewer's contention that the district court erred because [Guidelines section 3B1.3] does not ever apply to those who gain their positions of trust through misrepresentation is subject to de novo review because it represents a 'legal interpretation' of the enhancement").

Our precedent is clear that "parties cannot waive the proper standard of review by failing to argue it or by consenting to an incorrect standard." *See United States v. Venable*, 943 F.3d 187, 192 (4th Cir. 2019) (internal quotation marks omitted). Nevertheless, in this situation, "[w]e need not decide whether [Brewer] waived . . . this [argument]" — such that it would be subject to stringent plain error review — "because it fails even under de novo review." *See United States v. Spirito*, 36 F.4th 191, 202 n.8 (4th Cir. 2022).

14

where we recognized that the abuse-of-trust enhancement applies to "imposters." *See* 754 F.3d at 211 (recognizing that "abuse-of-trust enhancement also applies to imposters, so long as the imposter-defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust." (internal quotation marks omitted)).

According to Brewer, the abuse-of-trust enhancement unambiguously excludes "imposters," in that it applies only when a defendant abuses "a *position* of public or private trust." *See* U.S.S.G. § 3B1.3 (emphasis added). To that end, Brewer contends that the Guidelines require a defendant to have occupied an actual *position* of private trust — not merely acted as an "imposter" — for the abuse-of-trust enhancement to apply. Brewer thus claims that under *Campbell*, Application Note 3 — which provides that the abuse-of-trust enhancement "applies in a case in which the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not" — cannot expand the plain meaning of the applicable Guidelines text. Brewer's *Campbell*-related contention is unavailing for several reasons.

First, we reject Brewer's misplaced assertion that Guidelines section 3B1.3's text "unambiguously *excludes* imposters." *See* Br. of Appellant 23 (emphasis added). As discussed above, Guidelines section 3B1.3 applies when a "defendant abuse[s] a *position* of public or private trust[.]" *See* U.S.S.G. § 3B1.3 (emphasis added). But that language "can only be deemed 'genuinely ambiguous' if uncertainty exists 'even after a court has resorted to all the standard tools of interpretation,' including consideration of the 'text, structure, history, and purpose of a regulation.'" *See United States v. Boler*, 115 F.4th 316, 323 (4th Cir. 2024) (quoting *Kisor v. Wilkie*, 588 U.S. 558, 573 (2019)).

15

Contrary to the view espoused by Brewer, the plain language of the Guidelines suggests that the term "position," for purposes of the abuse-of-trust enhancement, refers to a position of private trust *relative to the victim*. That common sense understanding of the term "position" was confirmed by our 2011 *Brack* decision, wherein we recognized that

> the defendant assumes a position of trust, *relative to the victim*, that provides the defendant with the same opportunity to commit a difficult-to-detect crime that the defendant would have had if the position were *legitimately held*.

*See* 651 F.3d at 392-93 (internal quotation marks omitted) (emphasis added). And although *Brack* relied somewhat on Application Note 3 to come to that conclusion, we recognized *prior* to the Commentary's addition that "the 'position of trust' inquiry must focus on the relationship between the defendant and the victim from the perspective of the victim." *See Caplinger*, 339 F.3d at 236 (citing *United States v. Gordon*, 61 F.3d 263, 269 (4th Cir. 1995)). Stated succinctly, a "position" of trust can either be legitimately held or, as here, result from a defendant merely pretending to occupy such a position of trust vis-à-vis his victims. *See, e.g.*, *United States v. Gill*, 99 F.3d 484, 489 (1st Cir. 1996) (recognizing that "[t]he threat is equally present whether the lawyer or doctor is fully licensed or is a pretender sporting a vest or white coat and displaying a fake diploma. In both cases, the wrongdoer is using the ostensible position to facilitate or conceal the crime").

Second, we also agree with the government that the expressed statutory purpose of the Guidelines supports the inclusion of those who assume positions of trust by way of lies, deception, or misrepresentations. *See Boler*, 115 F.4th at 323. As we observed in *Boler*,

> [i]n promulgating the Guidelines, the Commission set out to 'establish sentencing policies and practices for the Federal criminal justice system that

> . . . avoid[] unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.

*Id.* at 327 (citing 28 U.S.C. § 991(b)(1)(B)).  Including imposters — such as Brewer — furthers the Sentencing Commission's goal of punishing those who are "more culpable" than others.  *See* U.S.S.G. § 3B1.3 cmt. (background).  As the Commission explained when it added Application Note 3 in 1998, "particularly from the perspective of the crime victim, an imposter who falsely assumes and takes advantage of a position of trust is as culpable and deserving of increased punishment" as a defendant who has the actual credentials of the imposter.  *See* Editor's Notes to 1998 Amendment to U.S.S.G. § 3B1.3.

Third, even if we were to assume that the term "position" is "genuinely ambiguous" as used in Guidelines section 3B1.3, we would yet be obliged to consult the applicable Commentary — Application Note 3 — to ascertain whether it falls within the "zone of ambiguity created by the ambiguous text" of the Guidelines.  *See Boler*, 115 F.4th at 323. In our view, Application Note 3's inclusion of "imposters" falls well "within the bounds of reasonable interpretation" by the Commission, and its "character and context" is entitled to controlling weight.  *Id.* at 327-28.  To be sure, Application Note 3 is the Commission's "official position."  *Id.* at 328 (quoting *Kisor*, 558 U.S. at 577).  It is also the byproduct of "well-reasoned decision making" by the Commission, given the pre-1998 circuit split in our sister circuits.  *Id.*  In sum, Application Note 3 reflects the Commission's "substantive expertise" and "fair and considered judgment," and it is entitled to controlling weight.  *Id.*

17

* * *

At bottom, whether the abuse-of-trust enhancement unambiguously includes those who pretend to hold a position of trust or, at the least, is "genuinely ambiguous," the result is all the same: the abuse-of-trust enhancement applies in this situation. Brewer repeatedly held himself out as a legitimate financial advisor in order to facilitate his extensive fraud scheme, and he occupied a position of private trust relative to his victim-investors. And the sentencing court's well-reasoned factual findings support that result. We are thus satisfied to conclude that the court did not err in applying the abuse-of-trust enhancement.

B.

Finally, Brewer challenges Supervised Release Conditions 17 and 22, arguing that those conditions of supervised release constitute an improper delegation of the sentencing court's Article III judicial authority to the Probation Officer.[5] But that argument is squarely foreclosed by our Court's recent decision in *United States v. Williams*, 130 F.4th 177 (4th Cir. 2025). *See* Gov't Rule 28(j) Letter, ECF No. 35 (maintaining that *Williams* forecloses Brewer's appellate challenge to supervised release conditions); *see also* Reply Br. of Appellant 13 (conceding that *Williams* forecloses argument regarding supervised release conditions but maintaining that "*Williams* was wrongly decided").

---

[5] Brewer failed to object to Supervised Release Conditions 17 and 22 in the sentencing proceedings. Such an unpreserved claim is generally reviewed on appeal "only for plain error." *See United States v. Elbaz*, 52 F.4th 593, 547 (4th Cir. 2021); *United States v. Groves*, 65 F.4th 166, 174 n.6 (4th Cir. 2023). As discussed below, our *Williams* precedent conclusively establishes there was no error made in the sentencing court's imposition of Conditions 17 and 22. As a result, there cannot be a plain error.

18

In *Williams*, our friend Judge Quattlebaum explained that, when a condition of supervised release provides that a Probation Officer's supervision includes the "provider, location, modality, duration, intensity, etc." of, for example, mental health and substance abuse treatment programs, the inclusion of such language is not an improper delegation of Article III judicial authority. *See* 130 F.4th at 187. Rather, *Williams* explained that such terms "establish[s] the broad principles of [a defendant's] special conditions — that he must participate in mental health and substance abuse treatment programs." *Id.* As *Williams* recognized, however, a Probation Officer is "only permitted . . . to fill in certain details, such as the particular provider, location and schedule of the programs." *Id.*

Put most simply, our recent decision in *Williams* controls in these circumstances. We therefore reject Brewer's contentions that Supervised Release Conditions 17 and 22 are improper delegations of the sentencing court's judicial authority.[6]

### III.

Pursuant to the foregoing, we are satisfied to reject each of Brewer's assignments of error regarding his 33-month sentence and affirm the judgment.

*AFFIRMED*

---

[6] We appreciate Brewer's concession that the *Williams* decision forecloses his appellate contentions regarding Supervised Release Conditions 17 and 22. That concession is consistent with the strict obligations that lawyers have "to act with candor in presenting claims for judicial resolution." *See McCoy v. Court of Appeals of Wis., Dist. 1*, 486 U.S. 429, 440 (1988). Notwithstanding that concession, Brewer's lawyer posits that "*Williams* was wrongly decided." *See* Reply Br. of Appellant 13. But we are dutybound to reject that contention and adhere to the *Williams* precedent. *See McMellon*, 387 F.3d at 334.